**UNITED STATES of America,
Appellee,**

v.

**Salvatore BONANNO and Peter Notaro,
Appellants.**

**Nos. 886, 887, Dockets 34806, 34807.**

United States Court of Appeals,
Second Circuit.

Argued July 8, 1970.

Decided July 28, 1970.

Robert Kasanof, New York City (Albert J. Krieger, New York City, of counsel), for appellants.

Jay S. Horowitz, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., for the Southern District of New York, John M. Burns, III, Walter M. Phillips, Jr., and Jack Kaplan, Asst. U. S. Attys., of counsel), for appellee.

Before FRIENDLY, SMITH and HAYS, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Appellants were convicted after a jury trial in the United States District Court for the Southern District of New York, Walter R. Mansfield, Judge, on one conspiracy count and fifty-two counts of mail fraud, in violation of 18 U.S.C. §§ 371, 1341, 1342. Appellant Bonanno was also convicted on two counts of perjury before a grand jury, in violation of 18 U.S.C. § 1621; appellant Notaro was acquitted on a single count charging the same offense. We affirm.

The facts center around the use by Bonanno and Notaro of the Diner's Club Credit Card of one Torrillo, their social acquaintance and business associate. They acquired the credit card through the efforts of the apparently violent-natured co-conspirator Perrone (deceased as of March 11, 1968), who visited Torrillo in January or February, 1968, and who allegedly intimidated Torrillo into surrendering his card and then departed with Notaro to give the card to Bonanno.

Bonanno and Notaro drove west for a sojourn in Tucson, Arizona, using the credit card and signing Torrillo's name for divers expenses along the way and for purchases once in Arizona. On one occasion Notaro represented himself to be Torrillo and used the credit card to convince a Tucson travel agent and an American Airlines employee to sell him on credit five airline tickets from Montreal to Tucson. In all, appellants charged fifty-eight bills totaling almost $2400; the bills were never paid.

The spending spree came to an end on March 11, 1968, when Bonanno, using Torrillo's credit card, attempted to make a moderate purchase at a Tucson department store and the sales clerk made a routine call to the Diner's Club Credit Approval Department in Los Angeles. The credit manager, desiring to question the card user, spoke briefly with Bonanno who claimed he was Torillo and who affirmed that he still lived and worked at fictitious places invented by the credit manager. The manager thereupon directed the department store to destroy the card and return it to the Diner's Club.

The defense claimed that Torrillo or Perrone authorized the use of the credit card, that appellants intended to pay the bills, and that Notaro was unaware of any irregularities in the card's acquisition and use.

The perjury charges arose out of Bonanno's testimony before the grand jury that he stopped using Torrillo's credit card as soon as he heard of Perrone's death (Perrone died about seven hours after the card had been impounded), and that he had consulted several Tucson attorneys about the propriety of using Torrillo's credit card, each of whom advised him it was all right (at trial the mentioned attorneys controverted Bonanno's account).

Appellants' principal claim on appeal is that the trial judge should have granted their motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure due to newly discovered evidence which the prosecutor had failed to disclose to the defense. The new evidence was that at the time of trial, Torrillo, a major prosecution witness, was awaiting trial on an indictment in the same district on a securities fraud charge.

Five days after the verdict, counsel for Notaro informed the court that he had just learned of the indictment and that he would bring a motion for a new trial. The Assistant United States Attorney responded that he had first learned of the indictment against Torrillo a week before trial when he interviewed Torrillo. At that time Torrillo apparently told the prosecutor that on the day Torrillo was arraigned he met counsel for Bonanno at the courthouse and revealed to him the securities charge.

The government argues that whether or not Bonanno's counsel was actually informed of the indictment by Torrillo, the prosecutor was justified in believing that Torrillo had informed him. Any remaining fear by the prosecutor that defense counsel did not know of the indictment was apparently put to rest by the prosecutor's confidence in defense counsel's thoroughness in researching government witnesses (as demonstrated particularly by their cross-examination of Torrillo in this case) and by the fact that Torrillo's indictment was an easily accessible item of public record.

In addition to stressing the purported good faith of the prosecutor's belief that defense counsel were already aware of the indictment, the government contends that the prosecutor believed that in any

event the indictment would have been inadmissible to impeach Torrillo's testimony since it did not charge a felony or a crime involving moral turpitude, and it was not at the time a conviction.[1] See United States v. Acarino, 408 F.2d 512, 515–516 (2d Cir.), cert. denied, 395 U.S. 961, 89 S.Ct. 2101, 23 L.Ed.2d 746 (1969).

■ First of all, as the government now admits on appeal, the existence of the outstanding indictment in the same district against a government witness is admissible evidence to show possible motivation of the witness to testify favorably for the government. See United States v. Lester, 248 F.2d 329, 334 (2d Cir. 1957). Even if the indictment were inadmissible at trial, this would not diminish its obvious value to the defense in preparing for trial and in giving it a lead to investigate possible governmental promises to the witness. See United States v. Polisi, 416 F.2d 573, 577–578 (2d Cir. 1969). Moreover, failing to disclose evidence valuable to the defense, even on the good faith belief by the prosecutor that it would be inadmissible at trial, deprives the defense of the opportunity to argue its admissibility and the court of its function of deciding the question.[2] Note, The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant, 74 Yale L.J. 136, 147–48 (1964).

Second, we agree with the trial judge that since Torrillo told the prosecutor that he had informed Bonanno's attorney of the indictment, "the prosecutor understandably, though erroneously, assumed throughout the trial that counsel for Bonanno and Notaro already knew of it." United States v. Bonanno, No. 68 Cr. 969, Unreported Opinion at 12 (S. D.N.Y. Feb. 15, 1970). But while such an assumption is understandable, it is not justified under the circumstances of this case. By failing to disclose the existence of the indictment against Torrillo on its assumption that the defense already knew of it, the prosecution served its narrow interest of securing a conviction at the peril of the diligent search for truth. There was nothing to be lost if the prosecution disclosed to the defense a fact it already knew; but if the defense did not already know, then nondisclosure by the prosecution resulted in the danger that a line of inquiry was foreclosed to the defense. Since the prosecution's belief was only an assumption, this danger was not insubstantial.

Moreover, at trial the defense vigorously attacked Torrillo's credibility by trying to establish a motive for Torrillo to testify favorably to the government against appellants, by attempting to show Torrillo's fears of prosecution on state charges and by pointing to the fact that Torrillo was never indicted for his admitted lies before the grand jury. This persistent defense attempt to show that Torrillo had a motive to cooperate with the government, together with the prosecutor's professed confidence in the thorough preparation of defense counsel, should have "flagged" the prosecutor's attention to the need to disclose the existence of the indictment by his office against Torrillo, since it was unlikely that the defense would intentionally forego such a useful piece of evidence.[3] See United States v. Mil-

1. Subsequent to the trial, Torrillo changed his plea to guilty to conspiracy.

2. "It would be unfair not to add that we have confidence in the good faith of the prosecution. Its opinion that evidence of the concealed knife was inadmissible was a reasonable opinion which the District Court sustained and no court has overruled until today. However, the case emphasized the necessity of disclosure by the prosecution of evidence that may rea- sonably be considered admissible and useful to the defense. When there is substantial room for doubt, the prosecution is not to decide for the court what is admissible or for the defense what is useful." Griffin v. United States, 87 U.S. App.D.C. 172, 183 F.2d 990, 992–993 (D. C. Cir. 1950).

3. The argument that the defense may have intentionally avoided mention of the indictment against Torrillo as a trial tactic

ler, 411 F.2d 825, 831–832 (2d Cir. 1969); United States v. Keogh, 391 F. 2d 138, 147 (2d Cir. 1968).

Nondisclosure by a government prosecutor of a known indictment by his office against an important government witness cannot be justified by assumptions that the defense already knows of the indictment or by self-serving judgments as to the admissibility of the indictment or its utility to the defense. See United States v. Acarino, 408 F.2d 512, 516 (2d Cir.), cert. denied, 395 U.S. 961, 89 S.Ct. 2101 (1969); compare, Leary v. United States, 383 F.2d 851, 868 (5th Cir. 1967), rev'd on other grounds, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), with United States v. Peterson, 170 F.Supp. 251, 253 (D. Utah 1959). In the instant case, however, the nondisclosure was only negligent. Appellants concede that the nondisclosure was not an instance of deliberate suppression with purpose to obstruct the defense and that it was not a failure to disclose evidence whose high value to the defense could not have escaped the attention of the prosecution. See Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957). Nor is this an instance where the prosecution has suppressed favorable evidence after a request for it by the defense. See Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed.2d 215 (1963). In such instances of active prosecutorial misconduct, a lesser showing of the materiality of the undisclosed evidence will suffice. See United States v. Polisi, 416 F.2d 573, 577 (2d Cir. 1969); United States v. Miller, 411 F.2d 825, 831–832 (2d Cir. 1969); United States v. Keogh, 391 F. 2d 138, 146–147 (2d Cir. 1968); Kyle v. United States, 297 F.2d 507, 513–514 (2d Cir. 1961).

Since the nondisclosure here was negligent, appellants must show that the indictment against Torrillo was material to the verdicts against them.

"Negligent or even intentional failure of the prosecutor to disclose an additional item of impeaching evidence would not invariably require that a verdict be set aside. * * * The test, however, is * * * whether * * * there was a significant chance that this added item, developed by skilled counsel as it would have been, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." United States v. Miller, 411 F.2d 825, 832 (2d Cir. 1969).

The materiality of the undisclosed evidence should also be "measured by the effect of the suppression upon defendant's preparation for trial. * * * "[4] United States v. Polisi, 416 F.2d 573, 577 (2d Cir. 1969); Note, The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant, 74 Yale L.J. 136, 145–47 (1964). We conclude that disclosure to the defense of the indictment against Torrillo would not have aided significantly in its preparation for trial, and that defense use of Torrillo's

---

to avoid rehabilitative evidence by the prosecution that Torrillo in June, 1968, told essentially the same story to New York City police, is without moment. While prior consistent statements may be generally admissible to rehabilitate testimony impeached by evidence of a motive to testify, see, e.g., United States v. Grunewald, 233 F.2d 556, 566 (2d Cir. 1956), rev'd on other grounds, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the indictment against Torrillo (in May, 1968) antedated Torrillo's June, 1968 statements to the New York City police, and thus the alleged motive to cooperate was already present. In any event, the defense's desire to avoid rehabilitative testimony is an attenuated and self-serving hypothesis of why the defense failed at trial to bring the indictment to light. A more probable explanation is that the defense was unaware of the indictment.

4. We stated this somewhat more generally:

"The evidence must also be shown to be material and of some substantial use to the defendant." United States v. Tomaiolo, 378 F.2d 26, 28 (2d Cir. 1967).

indictment to impeach his trial testimony would not have raised a doubt in the minds of the jury as to appellants' guilt.

Torrillo's trial testimony dealt only with the manner that appellants acquired the credit card, allegedly through Perrone's intimidation of Torrillo. The central issue raised by the defense was whether appellants used the card in good faith. As the trial judge charged, the jury was entitled to convict appellants even if Torrillo had authorized the use of the card and even if appellants intended to pay the charges, so long as the jury found that appellants intended to mislead the various merchants by impersonating Torrillo in order to induce sales on credit which they believed would otherwise not have been forthcoming. See p. 4026, *infra*. The evidence of this latter intent to mislead merchants is overwhelming.[5] Whether or not the card was extorted from Torrillo bore only indirectly on the factual question of whether appellants intended to mislead merchants by impersonating Torrillo and signing his name. Moreover, even if Torrillo's testimony were discredited by evidence of a motive to cooperate with the prosecutor, this would only weaken the evidence of extortion of the card and would not bolster the defense's theory that the card's use was authorized.[6]

Appellants' other contentions require little discussion. Appellants claim that the judge's charge to the jury on fraudulent intent deprived them of their defense of good faith use. The judge charged:

" * * * if you find beyond a reasonable doubt that they [appellants] schemed to misrepresent themselves as Torrillo in order to deceive the Diner's Club and establishments into furnishing goods and services that would not have been furnished if they had disclosed their true identities, * * * you may find that there was a scheme to defraud regardless whether the card was borrowed or extorted, regardless whether Perrone gave the defendants authority to use the card, and regardless whether they intended ultimately to pay for the goods and services.

If on the other hand, you find that the defendants believed that their representations of their identity was immaterial, or that they had the right to use the card, you would find that there was no scheme to defraud."

The charge was substantially correct and we perceive no reason to require proof of intent to defraud the named credit card holder, Torrillo, when there was sufficient proof of intent to defraud sales establishments and the credit company by impersonating the signing the

5. Some of the evidence is as follows: (1) Bonanno's abortive impersonation of Torrillo when talking on the phone with the Diner's Club Credit Department; (2) Bonanno's prior warning from a Tucson attorney that there was a forgery problem and that he should be careful; (3) Bonanno's offer to the same attorney to give him a suit if he could tell Bonanno where he could buy clothes with Torrillo's credit card; (4) and both appellants' use of other credit cards without permission and without payment; (5) Notaro's impersonation of Torrillo to purchase airline tickets on credit after a previous attempt had failed.

6. Similarly, a defense question put to Torrillo about Torrillo's equity in Bonanno's house, bore only indirectly on whether Torrillo authorized the use of his credit card; to the extent Torrillo was secured against Bonanno's debts he would be less fearful of Bonanno's use of the card. And the alleged authorization by Torrillo itself was only one factor in whether appellants intended to defraud the merchants and the Diner's Club. In view of the marginal relevance of the question, the trial judge, in his discretion, was entitled to sustain the prosecution's objection in the absence of any evidentiary foundation for the inference that a possible indebtedness by Bonanno to Torrillo implied that Torrillo authorized the use of his credit card.

name of Torrillo. See generally, United States v. Andreadis, 366 F.2d 423, 431 (2d Cir. 1966), cert denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967); United States v. Baren, 305 F.2d 527, 528 (1962).

Appellants' contention in regard to the prosecutor's mention of the manner of Perrone's sudden death on March 11, 1968, is without merit.

Affirmed.