UNITED STATES of America,
Appellee,

v.

Edmund ROSNER, Appellant.

No. 523, Docket 74–2290.

United States Court of Appeals,
Second Circuit.

Argued Dec. 18, 1974.

Decided April 29, 1975.

**270**

Alan Dershowitz, Cambridge, Mass. (Nancy Rosner, New York City, Jeanne Baker, Boston, Mass., of counsel; Marc Dorfman and Ann Greenblatt, law students, on the brief), for appellant.

Elliot G. Sagor, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty. for S. D. N. Y., Jeffrey I. Glekel and John D. Gordan, III, Asst. U. S. Attys., of counsel), for appellee.

Before FRIENDLY, TIMBERS and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

Robert Leuci, a corrupt New York City police officer, acted in an undercover capacity for the United States Attorney for the Southern District of New

1. On August 16, 1974, Judge Wyatt, to whom sentencing had been transferred, resentenced

York. In that capacity he obtained evidence and testified against Edmund Rosner, a lawyer, who was convicted of bribery, obstruction of justice and conspiracy on December 5, 1972. After the conviction had been affirmed by this court, United States v. Rosner, 485 F.2d 1213 (2 Cir. 1973), and while a petition for certiorari was pending, appellant Rosner filed a motion for a new trial on March 19, 1974 on the ground of newly discovered evidence to the effect that Leuci had lied at the trial concerning the extent of his own past criminal misconduct. F.R.Cr.P. 33. At the trial, Leuci had admitted his complicity in corrupt dealings on four separate occasions with criminal defendants or subjects of investigation, but had denied any other such involvement. He had testified frankly that he did not expect to be prosecuted.

The thrust of the new trial motion was that Leuci had furnished narcotics to informants and others, acts which he had denied at trial. During the pendency of the motion on April 17, 1974 Leuci admitted to the United States Attorney's office that he had committed many acts of criminal misconduct in addition to those he had revealed at trial, among them furnishing narcotics on two occasions to an informant, Richard Lawrence.

On June 10, 1974, after being informed by the Solicitor General that Leuci had perjured himself in concealing additional criminal activities, the Supreme Court denied certiorari without prejudice to consideration by the District Court of the motion for a new trial. Rosner v. United States, 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974). Judge Arnold Bauman held a hearing, thereafter, in July 1974, and, in an opinion dated August 15, 1974, denied the motion for a new trial.[1] This appeal followed. The primary issue posed is whether evidence solely of an impeaching nature that an important government witness had in fact committed crimes which at trial he

appellant to concurrent terms of three years on each count.

denied committing requires us to order a new trial.

A second, related issue is also presented. Rosner contends that the government prosecutors were aware of two specific pieces of evidence tending to implicate Leuci in criminal activity, evidence which they did not turn over to the defense before trial and which, if turned over to the defense, would have been useful for impeaching Leuci's credibility. He also contends that the prosecution withheld this evidence and additional impeachment evidence which came to light *after* trial, during the pendency of appellant's new trial motion.

To understand the issues presented by this appeal, it is necessary to advert briefly to the facts proved at trial.

In October 1971 Rosner was under indictment along with Nicholas De Stefano in a case charging subornation of perjury. Leuci, acting in an undercover capacity, approached De Stefano and Nicholas Lamattina and offered to provide through a supposed contact in the United States Attorney's office information about cases pending in the District. The matter of the Rosner indictment came up first during a meeting of Leuci, De Stefano and Dominick Marcone, another target of investigation, on September 30th.

Rosner eventually came into the negotiations and participated in the payment of several thousand dollars to Leuci in exchange for the statements of prospective witnesses and grand jury minutes in his case. There were five alleged separate payments over a period of three weeks, each of which formed the basis of a bribery charge. Rosner was acquitted on two of these charges relating to payments occurring on October 4th and October 8th and was convicted of three others which involved payments occurring on October 12, 13 and 19. He was also convicted of conspiracy and obstruction of justice. Leuci testified for the government. It is agreed that he met Rosner five times. Recordings were made of the meetings on October 13th, 15th and 19th on a tape recorder concealed on the person of Leuci. The earlier meetings of October 4th and 8th were not tape recorded.

Rosner took the stand at his trial, and admitted that he had made the payments alleged on three occasions and that he had received the witnesses' statements and the grand jury minutes, as alleged, but he contended that he had been entrapped. De Stefano and Lamattina pleaded guilty just before the trial began, but neither was called as a witness by either side. There is no doubt that Leuci perjured himself on the extent of his own past misconduct during his years on the police force.

## I.

Although appellant does not claim that the government actually knew before trial the extent of Leuci's criminal activities, he does contend that there were two specific items of evidence in the possession of the government that should have been disclosed to the defense. One was the so-called Leuci-Lawrence tape and the other the so-called Goe Memorandum.

The Leuci-Lawrence tape came about as follows. Leuci had been with the Knapp Commission where he worked with Nicholas Scoppetta (later an Assistant United States Attorney), who was at that time one of the Commission's lawyers. In March of 1971, Scoppetta ordered Leuci to investigate the involvement of Richard Lawrence, previously identified as an informant of Leuci's, in a homicide in the Bronx. On March 29, 1971, during this investigation, Leuci tape-recorded a conversation with Lawrence, which yielded no information about the homicide, but can be read as suggesting that both Leuci and Lawrence had illegally seized narcotics following arrests and that Lawrence had been permitted to retain some of the narcotics. Scoppetta had listened to this tape in connection with the homicide investigation and had taken it with him when he transferred to the office of the United States Attorney. The tape was not disclosed to the defense prior to the

trial and only came to light during the final days of the new trial hearing when Leuci made an inadvertent reference to it.

The District Court found that the Leuci-Lawrence conversation was "neither as unequivocally inculpatory as Rosner claims, nor as exculpatory as the government argues." He found unequivocally, however, that during the course of the conversation "Leuci demonstrates a familiarity with procedures whereby Lawrence could obtain 'packages' of heroin resulting from arrests."

The second instance of governmental suppression alleged by Rosner involves the so-called Goe Memorandum. On July 13, 1972 Leuci was interviewed in the office of the United States Attorney by two agents of the Drug Enforcement Administration (DEA), Robert Goe and Joseph Gately. He admitted to them that in 1964 or 1965 he and three other government agents had conducted a warrantless search for drugs, during which they had come upon and divided equally $200 in cash. This incident was recorded in what came to be termed the "Goe Memorandum." In early 1971, Leuci had made a separate admission concerning the same event to another DEA agent. Assistant United States Attorney Shaw had learned about the incident shortly thereafter. None of the government prosecutors who participated in the trial was aware of it until April 9, 1974.

■ In order to accommodate conflicting policy considerations, the standards governing a motion for a new trial based on evidence available to the government before trial vary according to the government's conduct relative to the information. If the government deliberately suppresses evidence or ignores evidence of such high value that it could not have escaped its attention, "a new trial is warranted if the evidence is merely material or favorable to the defense." United States v. Kahn, 472 F.2d 272, 287 (2 Cir. 1973), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). However, when the government's failure to disclose is inadvertent,

a new trial is required only if there is "a significant chance that this added item, developed by skilled counsel as it would have been could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." Id.; United States v. Miller, 411 F.2d 825, 832 (2 Cir. 1969); see United States v. Keogh, 391 F.2d 138, 147–48 (2 Cir. 1968).

■ The trial judge, after considering evidence on this point presented at a hearing on Rosner's new trial motion, found the government had not deliberately suppressed either the Goe Memorandum or the Leuci-Lawrence tape. He also found that neither piece of evidence was of such high value that it could not have escaped the prosecutor's attention. He pointed out, with respect to the Goe Memorandum, that Leuci had admitted on the stand that on four occasions between 1966 and 1968, he had sold information to targets of narcotics investigations, for which activities he had received approximately $6000 in payoffs. In comparison to such activity, Leuci's participation in an illegal entry and a $50 theft was "de minimis." The trial judge also concluded that the Leuci-Lawrence tape was ambiguous enough so that its "dubious value could readily have escaped a prosecutor's attention."

These are findings of fact by the judge who had presided at the trial and who had an opportunity to assess the credibility of the witnesses at the hearing. In the circumstances, our review is governed by the principle enunciated in United States v. Johnson, 327 U.S. 106, 111, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1946):

". . . it is not the province of this Court or the circuit court of appeals to review orders granting or denying motions for a new trial when such review is sought on the alleged ground that the trial court made erroneous findings of fact. [citing cases]. While the appellate court might intervene when the findings of fact are wholly unsupported by evidence [citing cases] it should never do so where it does not

clearly appear that the findings are not supported by evidence."

See also United States v. Pfingst, 490 F.2d 262, at 273 n.11, (2 Cir.), cert. denied, 417 U.S. 919, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974).

We have reviewed the testimony at the hearing and must conclude that the trial court's findings are supported by evidence and are not clearly erroneous. Our further review therefore proceeds under the standard enunciated above to govern situations of inadvertent nondisclosure.

## II.

The question presented, then, is whether there is a significant chance that skilled counsel could have developed the evidence of Leuci's criminality contained in the Leuci-Lawrence tape and the Goe Memorandum to impeach his credibility to the extent that a juror would be led to reasonable doubt about Rosner's guilt. We emphasize that the standard demands more than the possibility of a different result upon retrial. Any piece of new evidence might, in theory, alter the course and outcome of a trial, but a case is not automatically remanded whenever such new evidence emerges. An appellate court must weigh whether or not there is in reality a "significant chance" that the disclosure would have induced a reasonable doubt in the minds of enough jurors to prevent a conviction. United States v. Pfingst, *supra*, 490 F.2d 262 at 277; United States v. Kahn, *supra*, 472 F.2d at 287–

89; United States v. Mayersohn, 452 F.2d 521, 526–27 (2 Cir. 1971); United States v. Bonanno, 430 F.2d 1060, 1063–64 (2 Cir.), cert. denied, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970); United States v. Miller, *supra.*

We are not dealing here with government nondisclosure of direct, exculpatory evidence. Cf. Grant v. Alldredge, 498 F.2d 376, 381 (2 Cir. 1974). Nor are we dealing with perjury and government suppression of information that vitally concerns the motivation of the witness, such as evidence about consideration promised him by the prosecutor for his testimony. Cf. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); United States v. Sperling, 506 F.2d 1323, 1333–34 (2 Cir. 1974); see United States v. Butler, Slip No. 74–2201 (9 Cir. December 18, 1974). In this case there is no question of a concealed promise of immunity: Leuci told the jury that he did not expect to go to jail for his crimes.[2]

Nor, finally, are we dealing with a case as unusual as United States v. Miller, *supra*, where the government had inadvertently failed to disclose the fact that the government's primary witness, upon whose identification of the defendant the case depended, had been hypnotized during his earlier interrogation.

The sole issue before us is whether *additional* evidence tending *further* to impeach the credibility of a witness whose character had already been shown

---

**2.** Appellant argues that a potential witness who is also a potential defendant has a "special motive to lie or fabricate a case" so that he will continue to be of use to the prosecution. The perjury of such a person, Rosner contends, should not be considered merely impeaching but rather as bearing directly on the guilt of the defendant against whom the witness testifies. He cites United States v. Kinnard, 150 U.S.App.D.C. 386, 465 F.2d 566, 573–74 (1972), as primary support. The issues in *Kinnard* revolved around the circumstance that the informer-witness was a *narcotics addict* and subject to special instructions to the jury and to extrinsic proof of his addiction. Leuci was not a narcotics addict.

We agree, of course, that a witness who has committed a crime known to a prosecutor has a motive to cooperate with the prosecution. It is this fact which makes perjury concerning perjury bargains made between witness and prosecution so vital. E. g., Giglio v. United States, *supra.* But once the witness has admitted his vulnerability to prosecution which could result in substantial imprisonment and his awareness that he would not be prosecuted, the jury has before it the elements of the defense claim that the witness is committing perjury to save his own skin.

to be questionable, admissible only in the court's discretion, might have induced a juror who had no reasonable doubt of Rosner's guilt, to have such doubt. The District Judge, who had heard the testimony and received other evidence at trial, applying the correct standard, concluded that the additional impeachment information contained in the Leuci-Lawrence tape and the Goe Memorandum would not have "induced a reasonable doubt in the minds of enough jurors to avoid a conviction."

As we have seen, Leuci's admitted perjury related to his own misconduct, independent of the circumstances of this case, and not to any element of the substantive offenses with which Rosner was charged. Moreover, the prosecution's case rested on far more evidence than simply Leuci's testimony.[3] The *Rosner* case was unusual in that the defendant admitted his technical guilt of the elements of the offenses charged. Cf. United States v. Bonanno, *supra*, 430 F.2d at 1061, 1064. The appellant took the stand at the trial and confessed to having paid bribes to a person purportedly employed by the United States Attorney in return for obtaining documents to which he was not entitled, namely, statements of witnesses and grand jury testimony. His sole defense was that he had been entrapped by the Government and the sole support for that defense was his own testimony.

In brief, Rosner contended that the government had sent Leuci out to frighten him with stories that he was

being investigated for the murder of Hernandez, a witness in his perjury case, and that he was soon to be remanded to custody. In addition, he claimed that Leuci told him through De Stefano that he was being investigated for fixing a case brought against one Martinez; a grand jury was at the time considering evidence on that "fix" against a bail bondsman named Marcone. These revelations, appellant testified, made him sick and overpowered his judgment so that he succumbed to Leuci's offer to provide him with documents from the United States Attorney's office.

Rosner asserts that the overcoming of his better judgment occurred at the first two meetings between him and Leuci on October 4 and 8. These two meetings, which were also attended by De Stefano and Lamattina, were not tape recorded by Leuci. In basing his entrapment defense solely on the events of these meetings, Rosner put his own credibility on the line for the jury to weigh. He did not call De Stefano or Lamattina as witnesses in his support, perhaps on the assumption that they might not give favorable testimony in the light of their own involvement. He based his defense on his own account of the two meetings.

Rosner's present contention is, in effect, that further evidence tending to impeach Leuci's credibility would have induced a juror to give more credit to Rosner's own testimony in support of his entrapment defense.

It is true that portions of Leuci's testimony contradicted Rosner's account of

---

**3.** Appellant argues that the government on the appeal from the conviction relied strongly on the testimony of Leuci, and that this court, in its own opinion, also laid stress on the jury's apparent finding that Leuci was a credible witness. To consider the argument properly, it is necessary to review the contentions on the first appeal. On that appeal, Rosner, having been convicted by a jury after the issue of entrapment had been submitted to it, was forced to argue for an extreme position that the evidence showed entrapment as a *matter of law* and that the case should not have been submitted to the jury at all. The recital of facts by this court on the appeal from the

conviction must be read in the light of that contention. 485 F.2d 1213. There was ample evidence from Leuci that rebutted the claim that entrapment had been proved as a *matter of law*, and, accordingly, we took note of it. We did note, however, that Rosner's own credibility would, in any event, still have to be weighed by a jury and could not support dismissal as a matter of law. See United States v. Rosner, *supra*, 485 F.2d at 1222.

In sum, our references to Leuci's testimony were not to sustain the jury verdict, which was not at issue, but in rejection of Rosner's claim that he should have had a directed verdict of acquittal.

these two meetings in ways that tended to undermine the entrapment claim and to suggest Rosner's predisposition to commit the offenses charged. For example, Rosner testified that Leuci told him on October 4 that the United States Attorney was investigating Rosner for the disappearance and possible murder of Hernandez. Earlier, Leuci had testified on cross-examination that he might have discussed the witness' disappearance with Rosner on October 4, but did not testify that he told Rosner that the government believed Rosner might have had the man killed.

Leuci also testified that on October 4, Rosner had asked him specifically for 3500 material; Rosner denied asking for anything except whatever information Leuci happened to hear discussed around the United States Attorney's office. Finally, Rosner and Leuci differed as to whether Rosner had bribed Leuci at this first meeting.

With regard to October 8, the major difference between the two men concerns the conversation leading up to Rosner's decision to pay money to Leuci for the information he had supplied. Leuci testified in effect that the only questions were how much and when he would be paid; Rosner testified that he had been browbeaten into paying by De Stefano, Lamattina and Leuci. Leuci testified that Rosner asked him for more information on grand jury witnesses; Rosner denies it. Leuci testified that Rosner took with him a copy of the draft indictment against Marcone; Rosner denies taking it.

These conflicts are not insignificant, but it is easy in considering them to overlook the total context of the trial. When Leuci testified, Rosner was not confronted by a witness of assumed moral rectitude whose collapse from virtue might destroy the foundation of the prosecution case. Cf. United States v. Gordon, 246 F.Supp. 522, 525 (D.D.C. 1965) aff'd after remand and new trial, 127 U.S.App.D.C. 343, 383 F.2d 936, 938 n.2 (1967), cert. denied, 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968). Leuci was a confessedly corrupt policeman, a middleman in bribes and shakedowns, who frankly revealed that he did not expect to be prosecuted for his misdeeds.

Moreover, the jury seems to have viewed Leuci's testimony with skepticism. On the two bribery counts arising from the earlier meetings, where Leuci's word was the only evidence for conviction, the jury acquitted Rosner. While one cannot extrapolate from jury verdicts with mathematical certainty, it is nevertheless significant that Rosner was convicted on counts that were supported by tape recordings and acquitted on those that depended on Leuci's testimony alone. See United States v. Pfingst, *supra*, 490 F.2d at 268, 278.

Finally, the tape recordings of the meetings of October 13, 15 and 19, which were presented to the jury, contain significant evidence that is most damaging to Rosner's defense. The District Judge found that "Leuci was not the linchpin of the government's case; the tapes were." We agree. The tapes reveal not only the fact that Rosner was willing to pay Leuci for transcriptions of grand jury minutes in his subornation case, but also belie his claims of being browbeaten and of reluctance to participate in the corrupt endeavor. The bargaining disclosed on the tapes was not for information either about a murder investigation or the Marcone-Martinez investigation. It dealt only with evidence in Rosner's then pending subornation of perjury case, about which no threats had been made to Rosner.

The flavor of the tape recordings to which the jury listened can best be conveyed by some quotations from the transcript of the taped meeting of October 13. A discussion of the Hernandez investigation, which Rosner asserts terrorized him into bribery, is conducted in an offhand, cold-blooded manner. Leuci and Rosner had been discussing the fact

that the statement of one of the witnesses against Rosner was "missing" when the following exchange occurred:

Leuci: Alright, alright. Now they've interviewed, they interviewed some guys, some people. I don't know who they are.

Rosner: Right.

Leuci: We would know who they are if they were going to use them, but apparently, it didn't, it didn't work out.

Rosner: I know that. I know they did, and it didn't work out. I know exactly who they interviewed. It didn't work out because there was nothing absolutely nothing. They tried to concoct something from. They got one guy down in West Street now (inaudible 6 seconds). I know who the witness is.

Leuci: You're talking about Pulido.

Rosner: Yeh, they got him. He's in West Street now. Who else do they have to testify? Do they have Beltran? Do they have Hernandez? Now they say Hernandez's been clipped. I don't know if he's been clipped. I don't know to tell you the truth. I don't know whether he has been or not I don't. I'd like to know what the hell have they got, do they have anything more than Pulido.

Leuci: These people, these statements that you read, those three people would testify as to what they wrote in the statement.

Rosner: If they use those people, one of those three people, they're supposed to be missing.

What I was told by you, they think that I had this guy hit.

Leuci: No, no, no. They didn't say, you know, our man was clipped.

Rosner: . . . Because I didn't. I don't know. I was relying on what you . . .

Leuci: . . . They're saying, they're saying according to him that they're sure that a guy's been clipped

in this, because they just can't find the guy.

Rosner: That must be Hernandez, he seems to be missing ⎫ simul-
taneous
Leuci: That's as simple as that ⎭

Rosner: I don't know who the hell is missing. I thought maybe you knew. I don't know.

The transcript indicates that Rosner was interested in acquiring grand jury minutes of the testimony of witnesses against him, but was concerned about two matters: how much he would have to pay; how soon he would get the minutes.

With regard to the amount to be paid, the following exchanges occurred:

Leuci: I'm not worried about [my contact in the United States Attorney's office] if he makes a commitment to me, whatever, it is, you know, but he knows what he's doing, he's not doing it because he's you know, for love right.

Rosner: . . . right.

Leuci: Understand if he's getting paid to do it, then he'll have to do it. But that's where I am now.

Rosner: What does he have in mind?

De Stefano: Price, that's what we're talking about? I guess you both (inaudible two seconds).

Rosner: What I mean to say is what the [deleted] do you have in mind?

After discussing which witnesses' statements might be available, they return to discussing money. Leuci mentions a price of $1000 or $1500 for the grand jury minutes, "which you really don't need." Leuci then agrees to find out if the minutes are available and, at De Stefano's suggestion, guarantees to return their money if he cannot supply them. Rosner comments, "That's good." The following exchange then occurs:

Leuci: Alright, alright, alright, so listen, I'll put that, I'll put that to him, fifteen hundred dollars for the Grand Jury minutes, and aside from that, more important, a thousand I'm getting, you know.

Rosner: How long will it take him to get them?

Leuci: Well let's find out. Like I said to him, you know . . .

De Stefano: If we don't get it pronto, then we don't need em.

Rosner: . . . Doesn't do us any good to get it at the last minute.

De Stefano: We don't get it pronto, we don't need it.

Leuci: You're going to get it at the last minute anyway, right?

Rosner: . . . We'll get them as a matter of right anyway. So with us it's just a matter of time, and we're paying a lot of money for nothing. They finally agree that Leuci will supply the minutes by Friday.

Later on, after some courthouse gossip, the conversation returns to the grand jury minutes. Leuci affirms that he will get them by Friday and the others speculate about whether they should await the trial. Rosner comments:

The, that's what they're required to do—they don't have to do [deleted]—they go right by the book. The book gives it to you like after the witness testifies you get it but I'd like to know anyway—actually we're ready regardless, but, oh, I'd rather have it. I'd rather be forewarned (inaudible one second).

Thus, casually, Rosner agrees to pay $2500 to bribe a government official for grand jury minutes which he will receive in any case in less than a month.

When appellant joined Leuci and De Stefano at the next meeting on October 15, Leuci greeted him by saying "There is no reason for you to be here." Rosner asks Leuci "Do you think [your contact is] going to come up with anything?" and Leuci responds: "Easy, apparently there's nothing to it."

They then discuss the availability of witnesses in the subornation case.

Rosner: "I know they got one guy for sure, I would like to know about the other two, whether they located them . . ." and "But that guy is one of the three guys, I think,—see if you can get me the details of the other two either they can't locate them or what."

Rosner tells Leuci what to look for. He says:

"I'd like to know just, ah, who the one is they're having difficulty with—I mean who this guy's,—just what the story is—how" [inaudible two seconds].

Leuci: "I'm sure all that I can find out.

Rosner: And the other thing [inaudible] get all, eh, whatever [inaudible] you can get background on Pulido." [inaudible five seconds].

Leuci: Yeh, all right—you want his yellow sheet?

Rosner: Yeh.

There was a discussion on October 13 concerning whether Leuci could locate information about George Stewart, a defendant whom Rosner represented in a multiple-defendant case and who was suspected of having become a government witness. Leuci testified that De Stefano, not in the presence of Rosner, had asked him to find out whether Stewart, who was under indictment, had become an informant. The substance of this conversation is on the tapes.

On the October 15 tape, when Rosner joins them, De Stefano brings him up to date: "We're talking about Stewart, Eddie." Leuci says "if he is a real special, top-notch stool, it may not be available so easy." De Stefano says, in the presence of Rosner, "It's worth it, whatever, it is, worth it, I told you that."

When Leuci asks for more background on the matter, Rosner, after hearing the corrupt bargain, volunteers to provide information about his client in order to further Leuci's illegal endeavor: "I can

give you all the information. I don't have it right now." They discuss Stewart further and Rosner supplies information about Stewart's arrest. At the trial, Rosner's first explanation of the Stewart matter was that he thought De Stefano was helping a bondsman locate Stewart as a fugitive. His second explanation, on cross-examination, was that he believed De Stefano was helping the co-defendants get information about Stewart, Rosner's own client.

Beside the easy way Rosner falls in with the corrupt talk of Leuci and De Stefano, the tone of the tapes lends no corroboration to Rosner's story of the tremendous pressures assertedly brought to bear upon him. Since negotiations for the payment of money were ongoing, one would expect to find on the tapes strong pleas for information about the threatened remand, about who the witnesses were on the murder charge and about Rosner's own involvement in the Marcone investigation. Yet there is no question on the tapes by Rosner of where he stands on being remanded, a most likely subject of conversation if he had been told about a probable remand earlier. The tapes show that Rosner himself said that he was not interested in the Marcone situation, a most unlikely statement by a man purportedly "pressured" into criminality by a story that he was being implicated in that very case. Finally, as we have seen, in the portion of the October 13 tape dealing with Hernandez, the tone of the conversations on the tapes is not of a frantic, bewildered person falsely accused of murder. There are no direct questions by Rosner of a nature that would support his entrapment defense. How far have they gone in the murder investigation? Whom have they got? Is it serious? Is there anything new about the murder investigation?

The almost complete lack of such talk, the easy nature of the conversation among the participants, the bargaining about money, appellant's eagerness to get the Grand Jury minutes of his pending subornation case, and his participation in corrupt talk about Stewart made the tapes the strongest evidence against the credibility of his story that his mind had been overpowered by the notion of the prosecutor's suspicion that he had had Hernandez killed. In view of the evidence therein presented, it strikes us as highly unlikely that the shift in the trial equation produced by two additional pieces of impeachment information, one very minor and one ambiguous, aimed at a witness whose character was already tarred, would have been sufficient to change the result. We conclude that these items, no matter how skillfully used by defense counsel, would not have so altered a juror's perception of Leuci's credibility as to induce reasonable doubt of Rosner's guilt on the basis that he had been entrapped.

### III.

Rosner also contends that he is entitled to a new trial because the government knowingly used perjurious testimony, i. e., Leuci's denial of criminal conduct aside from the four episodes to which he admitted on the witness stand. The argument is that although the prosecutors did not actually know that Leuci was committing perjury, since Leuci was a part of the prosecution team, his perjury is attributable to the United States Attorney regardless of the actual knowledge of the Assistants who worked on the case.[4] It is true, of course, that Leu-

---

4. Rosner also argues that the government had "knowledge" of the perjury because Assistant United States Attorneys Shaw and Scoppetta knew of the existence of the Goe Memorandum and the Lawrence tape, respectively. Attributing their knowledge to the trial prosecutors, Rosner contends that the government should have corrected Leuci's perjury and that its failure to do so warrants granting him a

new trial under Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957) (per curiam).

This argument discounts completely the finding of Judge Bauman that the prosecutors did not consciously suppress the items and that the items were not of such high value as to stay fixed in their recollection in connection with the Rosner trial. It is certainly true that the knowledge of one prosecutor is attributa-

ci was himself aware of the full extent of his perjury about his past misconduct. We must therefore detail some of the facts that emerged after the trial concerning Leuci's criminal past.

In April 1974, Leuci admitted to the United States Attorney that he had performed the following crimes. On fifteen occasions Leuci shared money seized in arrests. He conducted several illegal searches and engaged in illegal electronic surveillance. He distributed small quantities of heroin to his informants for their personal use. He accepted money and narcotics from informants in return for allowing them to continue dealing. He sold information from police investigations to those being investigated. He participated in bribes. He accepted money from attorneys and on one occasion helped to bribe an Assistant District Attorney. He perjured himself in describing *his own* criminal conduct on several occasions, most notably at the Rosner trial.

■ Perjury by a government witness, unknown to the prosecution, does not ordinarily compel the application of standards for a new trial required in cases of government misconduct. United States v. Marquez, 363 F.Supp. 802 (S.D.N.Y. 1973), aff'd on opinion below, 490 F.2d 1383 (2 Cir. 1974); United States v. De-Sapio, 435 F.2d 272, 286 n.14 (2 Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971).

Here appellant argues, however, that the "prosecution" had to be fully responsible for Leuci's perjury *as a matter of law* because Leuci himself was part of that "prosecution."

■ The District Judge rejected the argument, partly on the ground that

Leuci was a mere witness to events who did not participate in the strategy of investigation or prosecutorial preparation of the case. We do not agree that Leuci was an ordinary witness. If the thrust of the distinction is that an undercover agent can never be part of the "prosecution" so that the prosecution can be held responsible for his coercion of witnesses, his suppression of testimony or his own perjury which vitally affects the trial, we would not agree. But the judge also relied on his finding that the perjury was unrelated to the *issues* being tried and was related, on the contrary, only to collateral and cumulative impeaching material concerning the witness' *own* past misconduct.

On that we agree. Appellant has called our attention to no case where an undercover agent committed perjury without the knowledge of the prosecution on a purely collateral matter affecting his own credibility. The cases cited by appellant fail to imply that in such case a new trial would be required. Appellant contends that he is entitled to a new trial under Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1958). While Mazei, the witness in a Smith Act case, was the paid undercover informant, the granting of a new trial did not depend upon his being deemed part of the prosecution team. *Mesarosh* involved that rare situation where a key witness who was accusing people of Communist affiliations had been conceded by the government to have testified against others in a Senate investigation in such a bizarre fashion as to raise the inference that he was either an inveterate perjurer or a disordered mind. His suspected perjury, it must be noted, was not with respect to his own past. He

---

ble to another in a case where a promise has been made to a government witness in consideration for his testimony. Giglio v. United States, *supra*. That is not true where the prosecutor inadvertently fails to recognize the importance of an item suitable for impeachment purposes in relation to a specific trial. To impute knowledge of perjury to the trial prosecutor when even the prosecutor who knew of the document, presumably even if he

were sitting in the courtroom, would not have remembered it as contradicting a witness' testimony concerning impeachment matters, would appear to stretch the doctrine too far.

Inadvertent failure to turn over 3500 material is, as we have seen, governed by a less stringent standard than is deliberate failure, and we think, so is *inadvertent* failure to correct a witness' testimony on collateral matters.

was a professional witness who was identifying many persons as directly involved in Communist activities.

Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942) was decided on the allegations of a petition for a writ of habeas corpus which were taken to be true. These allegations were that "the Kansas prosecuting authorities obtained his conviction by the presentation of testimony known to be perjured, and by the suppression of testimony favorable to him." 317 U.S. at 214, 63 S.Ct. at 178. The record indicates that the coercion of witnesses and the procurement of false testimony favorable to the prosecution was done by the police rather than by the prosecutor. See Curran v. Delaware, 259 F.2d 707, 713 (3 Cir. 1958). The Supreme Court simply remanded for a hearing. But the type of police activity—coercion of witnesses and procurement of false testimony directly involving guilt or innocence as in *Pyle*—is quite different from collateral perjury regarding the witness' own past that is cumulative.

In *Curran, supra*, the perjury committed by the police officer was his testimony that no other statements of the defendants than those admitted in evidence had been taken by the police—a lie the court found may have been "substantial in view of the pivotal issue of consent [in a rape case]." 259 F.2d at 712 (emphasis added).

■ In Barbee v. Warden, 331 F.2d 842 (4 Cir. 1964), ballistic reports and fingerprint tests tending to show that a revolver different from defendant's own had been used, were deliberately suppressed by the police. Finding that the police reports in question "had substantial evidentiary significance" id. at p.

844, the court held that the lack of the prosecutor's own knowledge about the suppression of evidence did not prevent the ordering of a new trial. We do not doubt that in such circumstances, suppression by the police rather than the prosecutor is enough to warrant a new trial.

Nor is the quality of the collateral perjury here like that in Giglio v. United States, *supra*, where the perjury of the government witness kept from the jury the true story of the consideration promised him by one of the prosecutors for his testimony. In cases like *Giglio* a burden is properly placed on government, for it should have known of the consideration promised and have aborted the perjured testimony concerning it at the trial. See also Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).

■ Leuci's past unrevealed criminal misconduct involved no bilateral arrangement to which the government was a party. The prosecution had no way of knowing Leuci's secret past life. Nor did Leuci's perjury involve new evidence vital to an issue directly involving appellant's guilt or innocence.[5]

We think, therefore, that in the circumstances of the case, the circumstances (1) that Leuci was an investigative informant rather than an investigator with authority to arrest in that status, or to direct investigations, (2) that the government could not have known his secret past, (3) that the matters about which he lied did not concern any consideration promised him, and (4) that the perjury involved solely his own misconduct in other situations convince us that his perjury should not be attributed

---

5. Judge Weinfeld's words in United States v. Marquez, 363 F.Supp. 802 (S.D.N.Y.1973), aff'd on opinion below, 490 F.2d 1383 (2 Cir. 1974), regarding the government's failure to uncover perjury by a witness are equally appropriate here:

"The government agents can hardly be accused of suppressing information which they did not possess. There is no basis for sug-

gesting, as movant does, that the FBI and the United States Attorney had an obligation to pursue the question of whether [the witness] had in fact [performed the alleged misconduct] and should not have accepted his denials at face value. The issue was totally unrelated to the guilt or innocence of the defendants . . .."
363 F.Supp. at 806.

to the prosecution, but must be measured by the standards applicable to government witnesses generally.

## IV.

Rosner's final argument is that the government suppressed evidence relating to Leuci's credibility on two occasions *after* the trial, and that the proper remedy for such misconduct is an award of a new trial to the defendant.

The first incident occurred in January 1973, a little more than a month after Rosner's conviction. At that time, the United States Attorney's office received word from the New York City Special Narcotics Prosecutor that an informant, Richard Lawrence, had extensive information about official corruption. During subsequent interviews with the United States Attorney's office, Lawrence asserted that he had had extensive illegal narcotics dealings with Leuci. The government agents were unable to locate persons with whom, according to Lawrence, he and Leuci had dealt in narcotics. Lawrence could not provide the names and addresses of these people. He was given a lie detector test by an independent agency and was reported to have failed. At that point, the United States Attorney abandoned the investigation.

Although Rosner's first motion for a new trial was pending before the court and was based on the contention that Leuci had sold drugs to several deponents and had lied about his criminal past at trial, the prosecutor failed to make Lawrence's allegations available to the defense. Judge Bauman denied appellant's first motion.

■ We think the United States Attorney's office erred seriously in failing to notify the defense about the Lawrence situation. Appellant is right that the prosecutor should not have made a unilateral determination of the credibility of Lawrence when what Lawrence was alleging fitted into the very pattern of conduct suggested by appellant's motion.

The question is whether there was prejudice to the defendant. The whole Lawrence story was ultimately developed at the subsequent hearing now under review.[6] Since Judge Bauman, after hearing the Lawrence story, decided against the appellant, it is hard to see why the same judge, hearing the same story, would have decided it differently at an earlier time. We have already noted our agreement with Judge Bauman that such testimony was, in any event, cumulative and impeaching. We must conclude that the defendant was not prejudiced by the prosecutor's failure to disclose Lawrence's statements to the defense on the first motion.

■ The second post-trial contention relates to the Goe Memorandum. As we have seen, Shaw was the only prosecutor who knew of the Goe Memorandum during the Rosner trial. On about April 8, 1974, over a year after trial, it came to the attention of Assistant United States Attorney Sagor of the trial prosecution staff. At that time appellant's petition for certiorari was pending in the Supreme Court and appellant had filed the new trial motion under review. Sagor recognized that the Goe Memorandum was 3500 material and should have been turned over to the defense counsel at the trial. Before a decision could be made about the Goe Memorandum, Leuci on April 17, 1974, disclosed the full range of his past criminal conduct.

The United States Attorney and his staff proceeded to discuss whether in view of the pending certiorari petition, the Supreme Court should be advised of these disclosures. Judge Bauman's findings on the issue were as follows:

On April 30, 1974, John D. Gordan III, the Assistant United States Attorney in charge of appeals, called Andrew Frey of the Solicitor General's office and informed him of the nature of Leuci's per-

6. Rosner did not call Lawrence at the hearing.

jury at the Rosner trial. The Solicitor General then wrote to the Clerk of the Supreme Court requesting that consideration of the *Rosner* certiorari petition be postponed until a supplemental brief could be filed. Members of the United States Attorney's office reviewed a draft of the brief before the Solicitor General submitted it in mid-May. The brief stated that "recent developments suggest that the principal government witness committed perjury at the trial of this case as to collateral matter raised by the defense in an effort to impeach his credibility", but did not review in detail Leuci's recent admissions of criminal conduct.

Appellant argues that the government should have specifically told the Supreme Court of the Goe Memorandum and the circumstances surrounding it as evidence of the government's knowledge of it during trial, as well as the details of Leuci's recent admissions of criminal misconduct.

Assuming that to be true, we are again confronted with the question whether that would have led to a different result. The relief sought by appellant was a hearing in the District Court and his motion for that relief was then pending. The Supreme Court, in its denial of certiorari, specifically preserved the new trial motion for hearing on the

basis of the Solicitor General's disclosure. 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672. In sum, enough was disclosed to carry appellant's point. The express mention of the Goe Memorandum could not, without a hearing on its background and relevance and, indeed, of the extent of the prosecution's knowledge and recollection of it, result in either a grant of certiorari or a summary grant of a new trial. Appellant got the most he could get from the Leuci revelations, a hearing.

Appellant argues, however, that he would have got more, a summary reversal for a new trial without the need for a hearing on the motion. For this suggestion he relies upon Mesarosh v. United States, *supra.*

It is true that on the strange facts of the *Mesarosh* case, a majority of the court voted for a new trial rather than a hearing, but, as we have seen, the circumstances were materially different. It was the government that moved in the Supreme Court for a hearing in the trial court.

The Supreme Court, in granting a new trial, recognized implicitly that a witness who was practically in the business of falsely accusing others could well have falsely accused the defendant appellants as well.[7] We do not believe that the Supreme Court with all the facts now

---

7. Appellant cites Williams v. United States, 500 F.2d 105 (9 Cir. 1974) as "dispositive of this appeal." *Williams* was one of a number of appeals from motions denying a new trial in narcotics convictions where five narcotics agents of the Salt Lake City office of the B.N. D.D. had pleaded guilty to violating the civil rights of a narcotics defendant, one Romero, by committing perjury at his trial. United States v. Mendelsohn et al., Crim.No.4337 (C.D.Cal.1969) (described in United States v. Chisum, 436 F.2d 645, 647–48 (9 Cir. 1971)).

These agents had been key witnesses against narcotics defendants, their respective identifications of the defendant in each case being important to his conviction. Relying on Mesarosh v. United States, *supra,* the Ninth Circuit granted new trials in several cases where it appeared that the perjury of which the agents were themselves convicted as a violation of civil rights were in investigations simi-

lar in nature and contemporaneous in time to the investigation of the particular narcotics defendant whose conviction was before the Court. See United States v. Williams, *supra,* 500 F.2d at 108. Convictions were upset in United States v. Chisum, *supra*; United States v. Miramon, 443 F.2d 361 (9 Cir. 1971) (conviction "rests almost entirely on the testimony of Agent Saiz"); United States v. Williams, *supra.*

The *Williams* series is clearly distinguishable on two grounds: 1) The narcotics agents fell into the class of professional purveyors of false charges as in *Mesarosh*; 2) we have carefully reviewed the evidence, as appears in the text, and failed to find in Leuci's testimony anything like the pivotal significance of the narcotics agents' testimony that they had bought narcotics from defendants whom they positively identified.

before us would have granted a new trial rather than a hearing to appellant. The Court reminded us in *Mesarosh,* 352 U.S. at 9, 77 S.Ct. at 5:

"It must be remembered that we are not dealing here with a motion for a new trial initiated by the defense, under Rule 33 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., presenting untruthful statements by a Government witness subsequent to the trial as newly discovered evidence affecting his credibility at the trial. Such an allegation by the defense ordinarily will not support a motion for a new trial, because new evidence which is 'merely cumulative or impeaching' is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial." [footnote omitted]

Thus, while appellant's counsel has argued forcefully and well, he has been unable to demonstrate any ultimate prejudice to appellant by the government's alleged misconduct.[8]

The order and judgment is affirmed.

**8.** After agreement on this opinion by our panel, we found that another panel (Hays and Feinberg, *Circuit Judges,* and Holden, *District Judge*) had filed an opinion in United States v. Seijo and Hildebrandt, 514 F.2d 1357 (2 Cir. 4/23/75). Although counsel for appellant Rosner has not yet had time to call the slip opinion to our notice, we shall consider it *sua sponte.* In the *Seijo* case, it came to the attention of the government after the trial that its witness, Torres, had falsely testified at the trial in stating that he had never been convicted of a criminal offense prior to his arrest in the case at bar. When the United States Attorney called this to the attention of our court, the panel reversed the conviction. As in all cases involving post-conviction developments, cases must largely turn upon their own facts within the principles outlined in our opinion.

As we read the opinion of the panel, the following points emerge:

1. The panel in *Seijo* quite properly began its assessment by stating that "In measuring the impact of the suppressed material, it is important to first consider the strength of the Government's case apart from the evidence given by Torres." at p. 1359.

2. "The essence of the Government's case against both appellants resides in the testimony of Leonard Torres." Id. at 1358; see also pp. 1363–64.

3. The connection between Torres and Seijo in relation to the offenses charged against Seijo was wholly uncorroborated.

4. Torres, unlike Leuci in the case on appeal, had admitted to no prior misconduct except for a juvenile adventure.

5. Torres, unlike Leuci, had actually been convicted of a crime. His criminal record was not only easily available from the F.B.I. but it actually had been sent to the United States Attorney where it had simply been misfiled. The case was thus one where the government was at fault in not discovering the past criminal record, a situation which concededly did not exist in the *Rosner* case.

The ultimate determination, of course, is whether the appellate court believes that there is a "significant chance" that the disclosure would have induced a reasonable doubt in the minds of enough jurors to prevent a conviction. See cases cited, *supra,* part II. For the reasons we have given *in extenso,* we do not believe that such a "significant chance" is present here.