Vincent PACELLI, Jr., Petitioner,

v.

UNITED STATES of America, Respondent.

No. 80 Civ. 3377(MP).

United States District Court, S. D. New York.

Nov. 25, 1980.

On Motion for Reconsideration Feb. 11, 1981.

Steven B. Duke, New Haven, Conn., Eric Freedman, New York City, for petitioner.

John S. Martin, Jr., U. S. Atty., S.D.N.Y., by Jane W. Parver and Mary Lee Warren, Asst. U. S. Attys., New York City, for the U. S.

## OPINION

MILTON POLLACK, District Judge.

Vincent Pacelli has moved under 28 U.S.C. § 2255 to vacate his 1972 conviction for conspiracy to distribute cocaine and heroin in violation of 21 U.S.C. §§ 812, 841 and for three substantive offenses connected therewith, involving one or the other of such narcotic substances. His conviction was affirmed, 470 F.2d 67 (2d Cir. 1972), cert. denied, 410 U.S. 983, 93 S.Ct. 1501, 36 L.Ed.2d 178 (1973). For the reasons appearing hereafter the motion will, in all respects, be denied.

### I.

Eight years after his conviction Pacelli asserts he recently learned of further details of the criminal background of a government witness, one Lorenzo Cancio, which allegedly were knowingly and perjuriously suppressed by Cancio and by the government in a conspiracy with the trial judge to defeat justice. He claims that, if revealed, the further details would have tended to corroborate testimony of Elisa Possas, a government witness, attempting to exculpate Pacelli as the source of cocaine and heroin trafficked in by her. Before the trial, Possas had confessed and implicated Pacelli as well as her boyfriend, the co-defendant Papadakos, as the source of the narcotics or the deals involved in the indictment. She pleaded guilty to every count

charged. However, when called as a government witness, her testimony at trial, to the government's surprise, had varied diametrically from her plea and was at odds with what she had told government agents orally before her arrest and in the post-arrest written statement she gave. On both occasions she had solidly implicated Pacelli as her source for narcotics and for the heroin she had sold to a government agent on May 20, 1971 which was the basis of Counts III and V of the indictment. At the trial Possas pretended not to know Pacelli and surprisingly named Cancio as her source of all narcotics. However, as is shown by the record, there was ample evidence independent of Possas which sufficiently established that Pacelli was guilty of the charges of narcotics violations on which he was convicted.

Pacelli avers in this application that he learned "recently" (?) from testimony that Cancio gave at a trial which took place six years ago, in 1974, the so-called Torres trial, that Cancio had perjured himself in Pacelli's trial in 1972 when he testified on cross-examination that he was under indictment in only three narcotic cases, although there was a fourth indictment against him, and by denying that he had dealt in drugs prior to 1971, when in fact he was a substantial trafficker with international connections and when he testified he dealt only in cocaine in 1971 between January and October, albeit he had sold heroin on consignment in August. Mr. Rosner, Pacelli's lawyer, astutely observed in his summation to the jury,

> Cancio very cleverly, admitted just so much as he had to admit and that is, he admitted that he committed the [narcotic, robbery and gun] crimes that he had been caught committing; he admitted the crimes that he had been indicted for, he didn't admit to anything else. (Tr. 597)

Pacelli says that he has just learned that Cancio had told a grand jury on October 7, 1971 of his sale of heroin in August 1971 on behalf of one, Aspilche. Cancio and others were indicted on the next day for Schedule I and Schedule II narcotics violations, the

fourth indictment mentioned above. It is not contended that this August heroin transaction by Cancio was in any way involved in or related to the charges in and the trial of the indictment against Pacelli herein, other than as an additional piece of impeachment matter. It is charged, that this impeaching piece of information was knowingly suppressed by the government prosecutor and that somehow (not explained) the trial judge knew the content of this testimony given in grand jury secrecy and, in alleged conspiracy with the government to obstruct justice, the judge and the prosecutor allowed the witness' "perjurious denial" of any heroin trafficking during the period in question to stand uncorrected.

Pacelli further charges that the government purportedly failed to disclose § 3500 and *Brady* material concerning Cancio. This charge relates to investigative reports of drug enforcement agents (not assigned to this case) allegedly suppressed by the government and made in the course of a different narcotics investigation originating in California, the Aspilche situation, which were pertinent to and came to light in 1974 at the *Torres* trial, that included accounts of Cancio's past drug activities, albeit that they are utterly devoid of any admissions of Cancio regarding pre-1971 drug trafficking or any other bad acts; and that nothing in the accounts is exculpatory of Pacelli and the accounts do not bear on Pacelli or the matters for which he was indicted in this case.

Concurrently with this motion under § 2255, Pacelli requested that his petition be assigned to a judge other than the trial judge, on the ground that Pacelli having levelled accusations which the trial judge allegedly would have to answer at a hearing as a probable witness, the trial judge was disqualified to pass on this application. That request has been denied. See Opinion of July 22, 1980 filed herein.

A careful scrutiny of the records and proceedings of the Court has been made. It must be apparent that the review has been seriously hampered by the lapse of about nine years since the events, the dispersal in the meantime of the government officials involved in various phases of the case, the difficulties of locating and assembling obsolete records, marshalling of the many proceedings and the inexorable dimming of memories. These have not been aided by petitioner's self-interested cutting and pasting together of bits and pieces of hearsay, speculation and conjecture. Indeed, it is highly questionable 1), whether legally, an application of this sort labelled under § 2255 to avoid the impact of Rule 33, Fed.R.Crim.P. on the grounds asserted here, should be entertained at all—and 2), what fundamental interest of justice is actually served by considering such a belated attack on a conviction under all the facts and circumstances present herein.

However, enough does appear in the available Court records and proceedings that have been assembled to show that the strident contentions and self-serving lurid rhetoric, speculations and conjectures put forth in the moving papers are illusory and wanting in material, objective fact. There is no reasonable likelihood that the disclosures that Pacelli here asserts should have been made in 1972 could conceivably have affected the jury or the outcome of Pacelli's trial in any way whatsoever. No reasonable doubt of Pacelli's guilt could have been created by any of the matters cited here where none existed previously.

## II.

*Lorenzo Cancio*

On February 7, 1972, the day before the trial actually commenced, Mr. Walker, the government prosecutor, provided Mr. Edmund Rosner, Pacelli's trial lawyer, with the name of Lorenzo Cancio as a prospective government witness who would testify on the next day. Mr. Rosner then stated the following:

I would bring this to Your Honor's attention. If I had this information earlier I might indeed have had sufficient time *to interview* Mr. Cancio in preparation for this trial. *I knew Mr. Cancio's whereabouts prior to today. Indeed, Mr. Can-*

*cio is a person who is known to me. However, I did not realize he was in any way involved in this case.* (Tr. 10)

Mr. Rosner was quite correct in saying that Cancio is "known to me." He was Cancio's lawyer in three narcotics indictments filed in 1971, as well as Pacelli's lawyer during that time. The Cancio cases were docketed as 71 Cr. 562 and 563 and 71 Cr. 1185 (in which he also represented Maria De Capo, Cancio's girlfriend). In saying that he (Rosner) "did not realize that he (Cancio) was in any way involved in *this* case" it is apparent that Pacelli had no plan at that time to name Cancio at the trial as the source of the heroin sold on May 20, 1971 to the government agent by Pacelli's agent, Elisa Possas.[1] Rosner knew then that Elisa Possas had named Pacelli and Papadakos as the source of the heroin, *he had a copy of Exhibit 9–A, the Possas confession* and knew that she had pleaded guilty to all charges naming her with Pacelli in this indictment.

It is a fair assumption from the trial record and the circumstances that the thought of asserting that Cancio, not Pacelli, was the source of the May 20, 1971 heroin, occurred when Elisa Possas performed her act subsequently on the witness stand. After Cancio's direct testimony, Mr. Rosner had announced "I have no questions of this witness". Mrs. Rosner on behalf of Pacelli's wife followed suit, she had no cross-examination. But Mr. Taikeff, representing defendant Papadakos, against whom alone Cancio had testified, in respect to cocaine only, then conducted a full cross-examination relating to the charges against the defendant Papadakos (Tr. 177).

In presenting Cancio to the jury on his direct examination the prosecutor had elicited from Cancio that he had been convicted of robbery and a gun charge and that he had pleaded guilty to three narcotic indictments each of which was for a 1971 cocaine distribution. Cancio's crimes were then raked over again on Mr. Taikeff's cross-examination along with other destructive

impeachment matter. Neither lawyer mentioned yet a fourth, a conspiracy indictment, 71 Cr. 1159, against Cancio which was filed on October 8, 1971 following his appearance before the grand jury on October 7, 1971.

In fact, by the time of the Pacelli trial that fourth conspiracy charge had become dormant and had been lodged on the Court's suspense calendar with the Assignment Committee and removed from the active docket of cases. The moving papers annex the Clerk's docket sheet on that fourth charge. Its contents seem not to have been understood by the moving party or are being misread. What it shows, is that the one count conspiracy indictment filed on October 8, 1971 was processed on that day by Judge Lloyd MacMahon who ordered warrants of arrest against all named defendants, other than Cancio, and the nominal assignment by Judge MacMahon of the case to the calendar of Judge Pollack. The docket sheet is so stamped. It also shows, that thereafter there is no notation of any notification to Cancio of the indictment or service thereof upon him; that he was not arrested thereon; that no bench warrant for his arrest was ordered or issued; and that he was never arrested or arraigned thereon and never pleaded thereto. The docket sheet shows further that no steps were taken in the case until January 18, 1972 when it was transferred from the active docket of Judge Pollack to the "Suspense" docket of the Court and marked "Statistically closed". As of that time no defendant had been apprehended, served with the indictment or arraigned thereunder. So far as Cancio was concerned this case was dormant, in Suspense and actually was nolle prosequid subsequently. An entirely different indictment on the crimes charged superseded this one in 1973 which omitted Cancio as a defendant. That was the indictment which resulted in the so-called *Torres* trial in 1974.

Thus, at the time of the Pacelli trial in February 1972, there was a dormant statis-

---

1. There has never been a statement in *Torres*, the Grand Jury testimony of October 7, 1971 or

in any investigative report, that Cancio ever supplied heroin to Elisa Possas.

tically closed fourth narcotics conspiracy charge on the Suspense docket that was not adverted to by the government or the witness or defense counsel when Cancio was questioned about the "three" active narcotic indictments.

Indeed when Cancio came up for pleading on the three indictments on November 15, 1971, prior to the time that the fourth case was placed on the dormant calendar, the Court had said

> THE COURT: That count in that indictment will be *carried until the date of sentence* on the other three indictments *and the Court will entertain an application [to dismiss] at the date of sentence in respect of the outstanding count in the fourth indictment* which is 71 Cr. 1159 where the defendant is charged with the crime of conspiracy in respect to sale and distribution of Schedule I and II Narcotic Drug Substances.
>
> It behooves you, Mr. Epstein, to look into that matter.
>
> MR. EPSTEIN: Yes, Your Honor, I will.
> THE COURT: And discuss with the U.S. Attorney and make the proper application at the time of sentence (pp. 11–12)

The obvious purpose of this colloquy was to clear the Suspense docket of that fourth indictment.[2]

In these circumstances, the omitted mention in February 1972 of yet a fourth indictment against Cancio by any of the lawyers or the witness has no significant evidentiary value or substance.

Pacelli also calls attention to Cancio's response to one question by Mr. Taikeff, when he said that between January 1 and October 1, 1971 he had dealt in "cocaine only", although on October 7, 1971 he had told a

grand jury that Aspilche had given him heroin on consignment in August 1971 and that he had disposed of it at that time, earning $5,000 therefrom.[3]

Again, at the threshhold it will be noted that this August heroin delivery from Aspilche was not related to any charge in the indictment against any defendant herein. But Cancio did not mention it and the government did not correct the Cancio answer on cross-examination of, "cocaine only" before October 1st.

The circumstances of record show conclusively both the immateriality of the actual fact and an evident explanation of the omission. 1) Cancio was called only and testified only as a witness against Papadakos on cocaine transactions; 2) The entire tenor of his 31 page cross-examination on which the error or omission occurred was laid on *cocaine*—heroin was never mentioned either on Cancio's direct or cross-examination; 3) The two word reference *"cocaine only"* came toward the end of a lengthy cross-examination repeatedly mentioning only *cocaine* transactions; *cocaine* was mentioned on 18 pages of the 31 page transcript and the word *"cocaine"* was used 42 times therein. Cancio, was a Spanish-speaking individual who claimed to have at that time an inadequate command of English. The examiner questioned Cancio about the cocaine transactions for which he was arrested first, in May and again, in October of 1971 and the following questions were then asked:

> Q. Between January 1, 1971 and October 1, 1971 *do you understand* that there are nine months?
>
> A. Between January—yes.
>
> Q. January 1 and October 1, that is a period of nine months, *do you understand* that?

2. Although the indictment charges Schedule I and Schedule II narcotics conspiracy, the conspiratorial overt acts recited in the indictment (71 Cr. 1159) make no express mention of heroin but do recite an act relating to cocaine, viz.: 1) On or about December 1970, Enrique Lopez introduced Lorenzo Cancio to Miguel Aspilche in New York, New York; 2) On or about May 1971, Miguel Aspilche delivered a quantity of cocaine to Lorenzo Cancio in New York, New York; 3) On or about July 16, 1971, Miguel

Aspilche caused a telephone call to be placed to Lorenzo Cancio in New York, New York.

3. The transcript of that grand jury testimony of October 7, 1971 was furnished to the Court at its request in October 1980 for *in camera* inspection and thereafter a copy was at the Court's direction furnished to Pacelli's lawyer. For convenient reference it will be annexed as an appendix hereto.

A. Right, right.

Q. Did you sell only *cocaine* during that period?

A. *Cocaine only* (Tr. 195–96).

The questions then went on for several pages without any further reference to this matter and related to the amount of bail that Cancio had to post in connection with his crimes, the indictments therefor, his willingness to cooperate with the government and the consideration that he expected therefor. He was questioned about the relationship with a co-defendant in connection with the October 1, 1971 *cocaine* sale and the testimony he had given as a defense witness in his girl friend's trial on a cocaine charge. (Tr. 197–203)

The chance reference to drugs other than cocaine was an unexpected turn in the evidence which was not followed up; there was no development in the trial up to that time which gave any drug other than cocaine any importance so far as concerned the witness Cancio, or the defendant Papadakos.

In the context and sequence and circumstances involved the omission of the prosecutor to jump up and correct the erroneous isolated response of the witness on a seemingly immaterial inquiry (other than for his character and credibility, already amply disclosed) was both understandable and excusable. The harsh suggestion of conscious omission and subornation of perjury by the prosecutor, or even of consciously purposeful misstatement by the witness, in this ambiguous frame goes too far. The actual trial scene showing both ultimate immateriality at the time of the incorrect answer and at most, excusable neglect, is as follows.

### 1. *Cancio's role in the trial*

Cancio was called as a government witness in the case to testify solely against defendant Jimmy Papadakos and that is what he did. The prosecutor, Mr. Walker, stated at the time Cancio was being sentenced by this Court what is undeniable fact, that:

... Mr. Cancio ... specifically gave testimony which contributed materially to the conviction of the defendant Papadakos on a narcotics conspiracy charge. (*United States v. Cancio*, Sentence minutes, 71 Cr. 562, 563, 1185 at p. 6)

Mr. Walker, the government prosecutor, made it clear on his summation that Lorenzo Cancio was called *only* as a witness against the defendant Papadakos and at no place did he connect Cancio with Pacelli or refer to Pacelli in connection with Cancio or vouch for Cancio in respect of Pacelli. He said:

Now, the other witnesses were not agents. There was Lorenzo Cancio. He testified for the government. Lorenzo Cancio has a bad record. He has been convicted on robbery. He is a narcotics pusher. I would like to say two things about that: first of all, it's not easy to get a witness to come in here and testify about criminal activities. You don't get a priest, you don't get Mr. Velie, or someone like that to come in here and testify about these activities because people like that don't participate in it. This is the underworld we are talking about. We are talking about criminals associating with criminals.

You wouldn't expect a priest to be able to talk about *Mr. Papadakos'* narcotics activities. The only witnesses to that kind of activity, unless they happen to be undercover agents, have to be criminals. So, don't be surprised at the fact that Lorenzo Cancio has a criminal record. Lorenzo Cancio and *Jimmy Papadakos* associated with each other and Mr. Papadakos picks his friends. The government doesn't pick the witnesses, such as Cancio. The case picks the witnesses, the defendant picks the witnesses, because he is who he is, and the events of the times pick the witnesses.

The other thing I would like to say about Lorenzo Cancio is that the government does not rely upon his testimony to convict the defendant *Papadakos*, because Alice Possas told Agent Lepore that Jimmy *Papadakos* could supply heroin ... etc. (Tr 617–18) (Emphasis added)

In his summation, Mr. Taikeff, the lawyer for Papadakos dwelt on the impeachment issue. He argued:

> The other source of evidence or testimony against my client comes from Lorenzo Cancio. Now, I think the very first question you have to seriously ask yourself about Lorenzo Cancio is can you trust anything that Mr. Cancio says or should you be wary of every word that comes out of his mouth (Tr 572).
>
> ... [H]e has the audacity to say to you, that between the day he was released on bail in the latter part of May, and October 1, 1971 he didn't do any other narcotics dealing ... Mr. Cancio would have you believe that he is such an unlucky criminal that every time he commits a criminal act he gets caught but, in between, when he is not getting caught, he doesn't commit any criminal acts. (Tr 573)
>
> I also suggest to you that it's hard to believe that the first time he ever sold narcotics was in 1971, which he conveniently selects because it's at or about the time that his indictments charge him with being involved in the narcotics traffic.
>
> Prior to that, he didn't get caught. Why should he admit anything to you? It would only be telling the truth but, after all, he didn't come here to tell you the truth. He came here to tell you whatever he thought would favor his own position best. (Tr 575)
>
> He further said, in response to my inquiry that his total career involved 5 kilograms or approximately 11 pounds of narcotics. That was his total career, as far as selling was concerned. Lisa, when she testified, stated that she recalls buying from him 5 kilos ...
>
> That man, when he took the stand, estimated the most that the government would know or did know about his previous activities and he knew that he had sold to Lisa 5 kilos and, since he was denying any prior involvement, he decided to say that his entire career was devoted to the five kilos and I suggest to you that that was a lie and the reason why he picked that number to lie about was to minimize your impressions of him as a narcotics dealer and at the same time not to reveal anything he didn't think the government already knew. (Tr 576)

Cancio's testimony after identifying Papadakos in the courtroom was that he had had four dealings in cocaine with him in 1971, twice in Cancio's hotel when he sold Papadakos a half kilo of cocaine and one time one eighth and two times in his apartment he sold him a half kilo of cocaine (Tr 167–68). He then related how he was paid for the cocaine. (Tr 168–176).

Significantly in the testimony he gave in the *Torres* case in 1974 Cancio again related that his cocaine dealings were with Papadakos and again there was no mention by him of any connection with or transaction with Pacelli and Pacelli's name was not referred to although Cancio was taken over the same ground as he had covered in the 1972 trial.[4] Moreover, even in *Torres*, Cancio did not testify that he had ever sold heroin to Possas.

Pacelli's lawyer, Edmund Rosner, summed up the proof against his client Pacelli on the heroin and telephone (May 20) counts, excluding Cancio from involvement therein:

> *The only proof* the prosecutor brings into court *against my client is testimony of agents* as to what Alice Possas is supposed to have said during the period of time that they were in contact with her between May 5 and May 21st (Tr 590) (Emphasis supplied)

The practical construction of the role of Cancio in respect to the case and particularly Counts III and V is best evidenced by what occurred. When it came time after Cancio's direct examination for the defense to cross-examine it was Mr. Rosner's turn to cross-examine first and he announced that,

---

4. The *Torres* transcript annexed to the moving papers taken from the Court's records recites Cancio's testimony in that case, that he came into the court as a government witness in the case *against Jimmy Papadakos* (pages 1146; 1175).

"I have no questions of this witness." It stands to reason that if Rosner expected at that time that Possas would, when she was called to the stand, thereafter attempt to shift the source of the heroin from Pacelli to Cancio (defense counsel had the signed statement of Possas, Exhibit 9A, inculpating Pacelli as the source), Rosner would have leaped on Cancio on cross-examination to exonerate Pacelli and there would have been no waiver of cross-examination of Cancio by Pacelli's lawyer. Mr. Taikeff against whose client Cancio had testified on the cocaine dealings did not waive cross-examination; he conducted a full cross-examination relating to the charges against Papadakos. (Tr 177).

The same evidence now relied on for a new trial was according to the Court's records and transcripts of proceedings known to and/or publicly available to defense counsel at Pacelli's trial, e. g.: the narcotics indictments naming Cancio, including 71 Cr. 1159 which charged Cancio with conspiring to distribute heroin and cocaine; Cancio's guilty pleas to three cocaine indictments in November 1971; the minutes of those pleas which reflect the pendency of the October 8, 1971 conspiracy indictment involving heroin (Schedule I narcotic drug-controlled) as well as the overt acts reciting Cancio's trafficking in narcotics between his May and October 1971 arrests, and the fact that this indictment might be dismissed at the time of Cancio's sentence. All of these were matters of public record.

Immediately after the jury's verdict herein, in a matter of a few days, Mr. Taikeff specifically utilized Cancio's heroin and cocaine conspiracy indictment of October 8, 1971, 71 Cr. 1159, as one of the bases of a claim under Rule 29(c), Fed.R.Crim.P. that Papadakos had been subjected to Double Jeopardy by the charge herein of conspiracy on which he stood convicted. In his papers thereon, Mr. Taikeff twice makes reference to Indictment 71 Cr. 1159 "filed October 8, 1971, naming Lorenzo Cancio". Mr. Taikeff was then sharing office space with Mr. Rosner and Mrs. Rosner.

The Court records show that the characterization on which Pacelli's motion is based is evidence "newly discovered" and "recently come to light"—is demonstrably false. But even more pertinently, the allegations made by Pacelli concerning Cancio are utterly collateral to Pacelli's conviction.

Cancio's testimony was completely immaterial to Pacelli's conviction and no further impeachment of Cancio would have rendered it material. *United States v. Di Francesco*, 604 F.2d 769, 774 (2d Cir. 1979). The government in no way relied on Cancio's testimony to support Pacelli's conviction. Pacelli's guilt was wholly proved outside of Cancio. The evidence apart from Possas-Cancio would have convicted Pacelli and was in no way related to that attempted dispute. *United States v. Tramunti*, 500 F.2d 1334, 1349–50 (2d Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974).

### 2. The Possas reference to Cancio as her narcotics source

Until the witness Possas came to the stand it was never suggested by anyone that Cancio was the source of the heroin she had sold to Agent Lepore on May 20, 1971. The Agent was called to the stand before Cancio and before Possas testified and consistently with Possas' confession, he gave evidence that he had bought the heroin from her on May 20th (Count III), and that this was pursuant to the telephone arrangement he had overheard that she had made on that day with Pacelli to deliver that heroin (Count V). Possas' confession was given to the defense on the day before Cancio testified (Tr. 48).

It cannot be overlooked, as is mentioned in the government's brief, that witness intimidation was a serious concern of the circumstances of the trial. The killing of Possas' close friend and neighbor, Patsy Parks, a prospective witness against Pacelli, on the eve of the trial silenced her and was fresh in everyone's mind. Of course, Pacelli's complicity therein was proved only later. *United States v. Pacelli*, 521 F.2d 135 (2d Cir. 1975), *cert. denied*, 424 U.S. 911, 96

S.Ct. 1106, 47 L.Ed.2d 314 (1976). But the atmosphere of the trial was tense as can be gleaned from the trial record herein and concern over witness intimidation hovered over the trial as explained in the government's brief.

Possas had pleaded guilty to every Count in the indictment in which she had been named and in which she was coupled with Pacelli. Before her arrest she had fully implicated Pacelli and Papadakos in her conversations with Lepore, the undercover agent. After her arrest, she cooperated with the agents and gave them an explicit statement of the involvement of Pacelli and Papadakos, with whom she lived, of the cocaine and heroin transactions the three were involved in including the May 20th sale. She gave this orally and then she confirmed it in a signed written statement. But when brought to the witness stand by the government—the prosecutor drew a blank. Pacelli was sitting right in front of her—she said she didn't see him; she had never met him; she had never spoken to him; she had heard of him; she denied the phone talk with him on May 20th arranging for the sale of the heroin to the undercover agent; he had not supplied her with any narcotics, she said. In the course of her initial interrogation by the prosecutor she testified that Lorenzo Cancio was the one who had delivered the May 20th heroin to her, she had all her narcotic transactions with Cancio. She told the jury on direct examination repeatedly that Cancio was "her one and only source for drugs". Her agitated state on the witness stand stands out clearly in her responses in the record. (Tr. 240–52)

However, further questioning of Possas with the use of her signed statement disposed of her memory lapses, contradicted her earlier direct examination and corroborated the agent's testimony which independently implicated Pacelli on Counts III and

V. When her confession was introduced in evidence, Exhibit 9–A, Mr. Taikeff acknowledged "We have copies, your Honor" (Tr. 265).

### 3. The source of the May 20 heroin was squarely presented to and decided by the jury

Abundant evidence wholly independent of the trial testimony of Possas and Cancio was adduced that was sufficient to establish Pacelli's guilt to the jury. The government had very strong non-conspiratorial corroboration of Possas' conspiratorial statements. The evidence underlying Pacelli's conviction on Counts III and V included the phone call by Possas to Pacelli witnessed by Agent Lepore which set up the heroin sale; the use of a telephone signal in connection with Possas' communication to the Pacelli residence; the dialed phone number; the wedding invitation which revealed Pacelli's name. These and the other facts and circumstances as well as Rosner's summation put the May 20 heroin issue before the jury. See United States v. Miranda, 526 F.2d 1319, 1324 (2d Cir. 1975), cert. denied, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976). The Court of Appeals decision in dealing with Possas' conflicting stories made clear that the May 20th sale and telephone talk about it were decided by the jury in passing on Counts III and V. The August sale by Cancio of the Aspilche heroin adverted to in the October 8 indictment, made three months after the heroin sale by Possas which brought about her arrest on May 20, had no material bearing on Pacelli's guilt on Counts III and V.

In his summation, Rosner argued: [5]

Alice Possas testimony is far more worthy of belief than Mr. Cancio and Possas' testimony about her source for all of the narcotics being Cancio should, indeed, be believed. (Tr 597–98).

5. Up until three days before the Pacelli trial, Rosner represented all three defendants who went to trial, viz.: Pacelli, Papadakos and Jalaba. From representing Papadakos, Rosner knew the relationship between Possas and Papadakos. At the same time Rosner represented Cancio in 71 Cr. 563, which charged Cancio and Possas with sales of cocaine during May 1971 and in 71 Cr. 562 which charged Cancio with further narcotic transactions and conspiracies in May 1971 with Perdiz.

Significantly, after Possas testified, counsel had ample time to recall Cancio, which they did not do. There was no attempt to carry on the charade started by Possas or to shore up her attempt to shift from Pacelli to Cancio the source of the heroin. *United States v. Stofsky*, 527 F.2d 237, 245 (2d Cir. 1975), *cert. denied, sub nom. Hoff v. United States*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976). This undoubtedly tactical decision was to avoid riveting home the cocaine charges against Pacelli and establishing that the Aspilche heroin transaction at which Mr. Taikeff's isolated question had hinted, had occurred three months after the heroin charged to Pacelli.

### 4. Brady Material and § 3500

The contention is further made in the motion papers that the government failed to produce prior statements of the witness Cancio required under Section 3500. None such has been factually shown to exist—only conjectured. Pacelli has submitted no demonstrable evidence that his attorney did not know the matters he complains were suppressed.

The government specifically notified defense counsel in advance of trial that Cancio, unidentified theretofore as among the unnamed co-conspirators, was expected to be a witness. The Court thereupon expressly afforded the trial lawyers an opportunity *to interview* Cancio prior to his testimony and informed counsel that "the government is prepared to give you continuing access to such information as you require". The record reflects that no specific *Brady* or § 3500 requests concerning Cancio were thereafter made. Mr. Rosner stated that Cancio was known to him. Indeed, as we have seen above, Mr. Rosner was Cancio's lawyer initially in three of the narcotics indictments already been mentioned. *See, United States v. Tramunti, supra*, 500 F.2d at 1339. The publicly available minutes of Cancio's guilty plea proceedings of November 1971 reflecting the pendency of

the fourth indictment for post-May 1971 heroin trafficking were not requested by counsel albeit that Cancio on direct examination had testified that he had pleaded guilty to three indictments.

The petitioner merges with Cancio's cooperation in 1971 the immunity arrangement made only in 1974 and spread on the record of the *Torres* case trial—so far as immunity from prosecution. No evidence exists of the kind mentioned, or any other kind. There is no evidence that the government granted Cancio any immunity prior to 1974. Cancio's testimony in the *Torres* trial, along with the statements of the prosecutor and Cancio's attorney, all establish that Cancio had never been fully cooperative and/or honest with the government until he entered into an agreement with them sometime in 1974. He repeatedly said therein that he concealed his drug history and other misconduct in 1971–72 from and had misinformed the government and went so far as to testify his testimony to the grand jury on October 7, 1971 was perjurious.[6]

### 5. Inducement to Perjury

Finally, there is no evidence that the government "probably induced Cancio to commit perjury concerning his narcotics activities and his relationship with the government". These statements in the motion papers seemingly are pure inventions for self-serving purposes.

■ To summarize: No evidence material to defendant Pacelli's guilt or punishment was withheld by anybody. Cancio's credibility was material only in his testimony against Papadakos—he was not questioned by anybody about the May 20th heroin, he was not confronted with the story told subsequently by Possas when she attempted to exonerate Pacelli; Cancio did not testify in *Torres* in 1974 that he had anything to do with the May 20th heroin or for that matter any heroin transaction with

---

**6.** It is a mystery why Pacelli should now rely on Cancio's testimony in *Torres* for anything. Cancio testified in *Torres* that the testimony he gave the Grand Jury on October 7, 1971 was false; "Q. When you went into that grand jury and testified under oath did you commit perjury? A. Yes, sir." (R. 1200).

Possas; he did not testify, nor was he understood by Pacelli, or the latter's lawyer Rosner, or any other lawyer in the case to have testified in 1972 against Pacelli. Thus, no rights of Pacelli under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) were violated. The government did not fail to produce Jencks Act data and, even if the stray items collected by the moving party under the aegis of a lawyer who was not at the trial and here magnified on behalf of the petitioner are to be considered as such data, they are insignificant, immaterial and omission, if there was any, harmless.

There is no evidence in the record or in anything now relied on that permits an inference or raises a factual issue that the non-disclosure of further impeaching matter was intentional or calculated or anything more than the inadvertent failure to recognize the significance, for impeachment purpose only, of a single response to an isolated question the importance of which was not even seized upon by defense counsel until sometime later in the trial—petitioner's suggestive speculations and conjectures to the contrary notwithstanding.[7]

Parenthetically, the Cancio testimony amending his 1972 evidence was given in 1974. If it took Pacelli six years to view Cancio in the light of someone who could have strengthened the discredited Possas' testimony exculpating Pacelli—then certainly the failure of the prosecutor in the heat of the trial to recognize this from a two word answer "cocaine only"—put unexpectedly at the tail end of a repetitive cocaine inquiry (42 times on 18 pages of transcript) becomes an understandable and tolerable trial oversight.

The witness Cancio's criminality was made abundantly clear to the jury. His character and past were adequately bared to contradict his cautious understatements. More would have been only a duplication of

enough already. It is incontrovertible that Cancio's criminal activities and his non-disclosed and inconsistent statements thereof in 1972 and 1974 were unrelated to the subject of the drug transaction in Counts III and V of the indictment on which Pacelli was being prosecuted.

The moving papers further contend that in the course of Cancio's brief cooperation with the government prior to the Pacelli trial, in relation to the Aspilche investigation, Cancio had received $375 in reimbursement ($25 a day) for a trip to California with a federal agent, on a fruitless effort in July 1971 to seize narcotics that the trip was designed to get. Similarly, Cancio's bail on the cocaine charges for which he was under indictment had been lowered from $30,000 to $15,000 with the aid of the government. The non-disclosure thereof are plainly immaterial on the issues of Pacelli's guilt and punishment and if disclosed could not conceivably have created the reasonable likelihood of a different verdict or reasonable doubt in the mind of any juror who had none without the information.

### III.

The remaining point made on the motion—that the government's surprise was not genuine at the turn that Possas took when she came to the stand, in repudiating her co-conspiratorial statements and her post-arrest confession, is little short of preposterous. (For convenient reference a copy of Exhibit 9A is appended hereto.)

The identical argument was made to (Aplt Br. 13) and rejected on the appeal to the Court of Appeals (470 F.2d at 69) and in the petition for the grant of certiorari to the Supreme Court. The arguments that the admission of Possas' statement violated petitioner's right to due process of law under the Fifth Amendment and the hearsay rule of evidence in effect in the federal

---

7. The government, wary of witness Cancio, made clear to the jury that Cancio was a criminal, and "underworld" and a generally untrustworthy character; that the government was forced to accept (but not rely upon) as witnesses those who, had participated or consorted

with the defendants under indictment. (Tr. 617–18). Mr. Rosner was not deceived in any way about Lorenzo Cancio. *See United States v. Brown*, 582 F.2d 197 (2d Cir.), *cert. denied*, 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978).

courts, were given short shrift in both courts as they should be given again hereon. The record sufficiently answers the attempted resurrection of the same point.

### IV.

The cases that support the dismissal of this petition are abundant.

Numerous cases support the proposition that when a witness has already been thoroughly discredited, the failure of the government to turn over more impeachment information is not material. *United States v. DiFrancesco, supra,* 604 F.2d at 774; *Ostrer v. United States,* 577 F.2d 782, 787 (2d Cir. 1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1018, 59 L.Ed.2d 72 (1979); *United States v. Gugliaro,* 501 F.2d 68, 73–74 (2d Cir. 1974).

Even in a case of demonstrable, conscious perjury of a government witness, which concealed strong impeachment evidence, it was said nonetheless that:

> new evidence which is 'merely cumulative or impeaching' is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial. *United States v. Rosner,* 516 F.2d 269, 283 (2d Cir. 1975), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203, *rehearing denied,* 429 U.S. 988, 97 S.Ct. 513, 50 L.Ed.2d 602 (1976) (quoting *Mesarosh v. United States,* 352 U.S. 1, 9, 77 S.Ct. 1, 5, 1 L.Ed.2d 1 (1956)).

Courts routinely refuse to label similar omissions of past convictions or charges as perjury when viewed against a record replete with suggestions of a particular individual's criminal character. *United States v. Rosner, supra; Brach v. United States,* 542 F.2d 4 (2d Cir. 1976).

When a case takes an unanticipated verbal turn it is easy to fail to grasp the full significance that is attributed to it by hindsight. The prosecutor's failure to recognize the potential impeachment significance of Cancio's statement "Cocaine only" is surely understandable:

> Any lawyer who has prepared and conducted a trial like this one . . . knows how easy it is to forget items in his files that an unexpected turn in the evidence has made helpful to his own case, let alone those that might aid his opponents—something which, under our adversary system, is not exactly in the forefront of his mind.

*United States v. Keogh,* 391 F.2d 138, 147 (2d Cir. 1968) (Friendly, J.).

> Since this must happen to the most scrupulous prosecutors and the issue of deterrence scarcely arises, the problems of the courts and the wider interests of society unite to require a substantially higher probability that disclosure of the evidence to the defense would have altered the result. To invalidate convictions in such cases because a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict would create unbearable burdens and uncertainties. *Id.* at 148.

■ Where as here the numerous allegations of the petitioner lack detailed factual allegations in support thereof and are speculative, conjectural and conclusory, particularly in respect to actual knowledge and intent, a § 2255 petition may be rejected on that ground alone. *King v. United States,* 576 F.2d 432, 438 (2d Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978); *United States v. Balistrieri,* 606 F.2d 216, 222 (7th Cir. 1979), *cert. denied,* 446 U.S. 917, 100 S.Ct. 1850, 64 L.Ed.2d 271 (1980); *Barry v. United States,* 528 F.2d 1094, 1102 (7th Cir.), *cert. denied,* 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88 (1976) ("Thus, the petition [2255] that was employed to support the claim that petitioners were entitled to a hearing was essentially predicated on conjecture and speculation").

■ The speculations, assumptions and conjectures made in the moving papers—all bottomed on hearsay are insufficient to warrant a hearing:

> Mere generalities or hearsay statements will not normally entitle the applicant to a hearing, since such hearsay would be inadmissible at the hearing itself. The petitioner must set forth facts which he is

in a position to establish by competent evidence. *United States v. Franzese*, 525 F.2d 27, 31 (2d Cir. 1975), *cert. denied, sub nom Potere v. United States*, 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 328 (1976) (quoting *Dalli v. United States*, 491 F.2d 758, 760–61 (2d Cir. 1974))

In rejecting this motion without a hearing it is useful to remember Mr. Justice Stewart's comment in *Machibroda v. United States*, 368 U.S. 487, 495, 82 S.Ct. 510, 514, 7 L.Ed.2d 473 (1962): "The language of the statute [2255] does not strip the district courts of all discretion to exercise their common sense."

*United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) teaches that materiality is the crucial factor in such a review as this. This case passes the strictest test imposed: there is no reasonable likelihood that the false testimony could have affected the judgment of the jury; and clearly this case passes the less stringent test, viz., that the "suppressed" evidence, in the context of the trial record as a whole does not "create a reasonable doubt that did not otherwise exist." *See also: United States v. Provenzano*, 615 F.2d 37, 46 (2d Cir.), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980).

In assaying materiality in this case, the fact that Cancio was not a witness against Pacelli at all, is dispositive apart from the chronological separation of the May 20 heroin transaction covered by the indictment and that involved in the Aspilche consignment in August. *See United States v. Rosner, supra*, 516 F.2d at 273 n.2. Cancio's role in the trial was minor and, as against Pacelli, he played no role at all. *See United States v. Provenzano, supra*, 615 F.2d at 49; *United States v. Bonanno*, 430 F.2d 1060, 1064 (2d Cir.), *cert. denied*, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970).

■ In *McWilliams v. United States*, 360 F.Supp. 470, 473 (E.D.Missouri, 1973), the Court appositely remarked:

No doubt, because of its untimeliness, petitioner has designated his motion as one filed under Section 2255, but such does not change its inherent character.

Moreover, even as a timely-filed motion it must fail since the petitioner has failed to show that with due diligence, the alleged new evidence, could not have been discovered before or at the trial. *United States v. Natelli*, 553 F.2d 5, 7 (2d Cir.), *cert. denied*, 434 U.S. 819, 99 S.Ct. 59, 54 L.Ed.2d 75 (1977); *United States v. Stofsky, supra*, 527 F.2d at 244.

■ It is well settled that where the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a *Brady* violation by not bringing the evidence to the attention of the defense. *United States v. Brown*, 582 F.2d 197, 200 (2d Cir.), *cert. denied*, 439 U.S. 915, [99 S.Ct. 289, 58 L.Ed.2d 262] (1978).

*See also: United States v. Tramunti*, 500 F.2d 1334, 1349–50 (2d Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974).

The extraordinary delay in presenting the claims herein carry self-evident prejudice to the government. Pacelli is entitled to no advantages therefrom. Rule 9(a), Rules Governing Section 2255 Proceedings; *Pacelli v. United States*, 588 F.2d 360, 365 (2d Cir. 1978), *cert. denied*, 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979).

Motions denied.

SO ORDERED.

## APPENDIX
## 18

### Government's Exhibit 9A

STATEMENT OF ELISA MARIA C. POSSAS GIVEN TO SPECIAL AGENTS THOMAS J. DEVINE AND E. JAMES KING III AT THE OFFICE OF THE BNDD, 90 CHURCH STREET, NEW YORK ON MAY 20, 1971. THE FOLLOWING STATEMENT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE. NO THREATS, FORCE, OR PROMISES OF REWARDS HAVE BEEN MADE TO ME AND THIS STATEMENT IS FREELY AND VOLUNTARILY GIVEN.

On May 20,1971 I was arrested by Federal Agents after I delivered a half kilogram of heroin to an undercover agent. The heroin that I gave to the agent had been hidden in the apartment of my girlfriend, Pat PARKS without her knowledge for about five days. On about May 15,1971 my boyfriend Jimmy PAPADAKOS told me that I would recieve a key to a subway locker with written instructions on exactly where the locker and the heroin was located. Someone put these instructions and a key under my apartment door and on the same day I went to the 14th Street subway and picked up a half kiolgram of heroin from a locker.

A few days later I went to Vinnie PACELLI and told him that I had picked up his package. I told him that I knew that he was the one that had put the heroin in the locker in the 14th Street subaway and he told me that I was correct and that the half kilogram of heroin belonged to him. I then told Vinnie that I wanted to sell this heroin to my own customer without Jimmy PAPADAKOS knowing about the sale. I asked Vinnie if he could replace the heroin that I sold to my customer before Jimmy PAPADAKOS found out that it was missing. Vinnie PACELLI told me that he would give me another half kilo of heroin in exchange for $11,000.00 after I sold the first half kilogram.

After I gave the heroin to the agent I then went to Vinnie PACELLI's house at 300 West 40th Street apartment #27-S, New York. I then told Vinnie that I had given his package to my customer and that I would recieve the money by 9:00pm that night. ( May 20,1971). Vinnie told me that he would stop at my apartment later in the night to see if I had recieved my money and if so, he would take the $11,000 that I owed him for his apckage. He also told me that if I had the money , he would then go and get ancther half kilogram of heroin to replaee the one that I sold. After I was arrested I tried to get in touch with Vinnie but I could not locate him. I called several places that I know he frequents but I was still unable to reach him.

I met Jimmy PAPADAKOS about two years ago here in New York. I started to live with him in his apartment and shortly afterward he taught me the business of dealing in cocaine and heroin. I sold $100.00 "spoons" of cocaine for Jimmy in several clubs and taverns throughout New York City. I also delivered cocaine in ounce and four ounce quantities and on accassion I delivered some quarter kilograms of cocaine to some of Jimmy's customers.

Vinnie PACELLI was Jimmy PAPADAKOS' connection for all of the heroin and cocaine that Jimmy supplied to his customers. In addition, JIMMY PAPADAKOS would deliver cocaine and herein to most of the customers that VINNIE PACELLI sold his narcotics.

WITNESSED BY: *Thomas J Divine*
5/20/71 *E. James King*

*Elisa Maria C. Possas*
ELISA MARIACCSTA POSSAS

---

## ON MOTION FOR RECONSIDERATION

The defendant Pacelli has moved (i), for reconsideration and relief pursuant to Rule 60(b), Fed.R.Civ.P., from an order herein of July 22, 1980 which denied a request that the Court should recuse itself and submit Pacelli's petition under 28 U.S.C. § 2255 to another judge for decision, and (ii), for relief pursuant to Rules 59(b) and 60(b), from a judgment entered on December 3, 1980 which merely recited that it was entered in consequence of an order entered on November 25, 1980 which had denied the § 2255 petition without a hearing.[1] Pacelli seeks to set aside that judgment and requests altered and amended findings of fact and conclusions of law and an order for a hearing on the petition under § 2255.

The application will be granted to the extent that the judgment entered December 3, 1980 is to be vacated as entered

1. No authorization or direction was given to the Clerk to enter such a judgment on the dispositive order of November 25, 1980 and the entry of a judgment was clerical error.

inappropriately through clerical error, and in all other respects, the motions, treated as applications for reargument of the two orders mentioned, will be denied.

As a preliminary, it is to be noted that no permission to bring on a motion to reargue either order was sought or granted. Where reargument is granted, that must be solely on the papers before the Court on the petition and the submission thereon. Moreover, nothing presented in the unorthodox fashion here employed by the defendant would require any different or modified view of the facts or of the files and the records and the results flowing therefrom as expressed in the Court's opinions on the orders in question.

## I.

Pacelli's petition under § 2255 was denied on the basis of the content of the files and records of the case which conclusively establish that he is not entitled to the relief sought.

Nothing in counsel's memorandum No. 2 or in the affidavit of Edmund Rosner warrants reconsideration and change in the orders heretofore made and in the opinions thereon. Indeed, there is substantial internal indication in the carefully contrived language and modifying words supplied, that the Rosner affidavit is an attempted diversionary effort, a red herring, and an imposition by the preparer of the affidavit on the Court and possibly even on Rosner and his pliant recollection. Rosner purports to express therein a faulty memory of the facts

and supplies only platitudes and conclusory statements referring to alleged habits and procedures he generally employed in handling criminal defenses while he was still a member of the Bar. The language and carefully interspersed modifiers used in the statements made in the affidavit, the significance of which might elude any but a cautious reader, indicate that the affidavit is in the voice of Rosner, but actually is the schooled verbiage, preparation and hand of a motivated preparer. Only such a person could—nine years later—evolve the studied recitations of details (of some only) buried in the files and records. The affidavit nonetheless falls short. Rosner appears not to have been fully refreshed.[2] This is adequately demonstrated in the documented analyses by the government in its memoranda in opposition to the motions.

The government has correctly pointed out that the papers submitted on the present motions contain many misreadings of the Court's opinion of November 25, 1980. However, the defendant gains no advantage from such convenient errors. The Court has come to the conclusion that mere oversight, inadequate preparation and insufficient study of the myriad matters in the variety of files and records pertinent to the § 2255 application, do not account for the presentation made hereon on behalf of defendant. Rather, the petitioner's submission has deliberately mangled the contents of the files and records, muddled the chronology and submerged the realities and material considerations in a bog of confusion, distortion and frivolous statements.[3]

---

2. For example: Rosner told AUSA Parver on October 23, 1980 that "due to more than 8 and ½ years which had elapsed since trial [he] could not state under oath that material had not, or had, been turned over to [him]." His affidavit now attempts to fudge his words and water down this understandable observation with speculations prefaced by such ruminations as "if I had material" and "if I did not" (Aff. ¶ 2).

Rosner's office associate who was retained as attorney of record for co-defendant Papadakos, apparently through Rosner, swore shortly after the guilty verdicts that he had a copy of the Cancio indictment in 71 Cr. 1159 charging cocaine and heroin offenses. Taikeff's Febru-

ary 25, 1972 affidavit twice refers to Indictment 71 Cr. 1159 "filed October 8, 1971, naming Lorenzo Cancio". This is precisely the heroin related charge that Pacelli and now Rosner attempt to assert was undisclosed. Seemingly, Mr. Rosner should have been refreshed more fully before he was asked to affix his signature to the current affidavit of disclaimer.

3. For example: the repeated assertion that AUSA Walker told the jury that the government was relying on Cancio is an evident distortion. Petitioner makes a recurrent claim that Walker improperly told the jury that Cancio dealt in cocaine and not in heroin. Walker's statement was absolutely correct since he was at that portion of his summation speaking

The files and records herein show (as the opinion of November 25, 1980 sufficiently indicates) that:

1. Cancio proved to be a minor figure in the totality of the evidence against Papadakos and of no significance at all as regards Pacelli;

2. Rosner, Cancio's lawyer, was adequately informed and had all the essential means of further information available to him regarding Cancio's drug criminality and involvement in international drug rings;

3. The prosecution did not mention or rely on Cancio to obtain Pacelli's conviction, nor did it rely on Cancio directly or indirectly as a witness against Pacelli or Possas (she had already pleaded guilty);

4. Cancio said nothing to impair the credibility of Possas nor could anything more he might have added to the record of his criminality have aided Pacelli, bolstered Possas, or impeached the evidence independent of Possas of Pacelli's guilt, or negated Possas' guilty pleas and involvement of Pacelli thereby, or impeached Exhibit 9–A (her confession); and

5. Every alleged factual claim made on the § 2255 application is unsupportable factually or legally when weighed against the files and records and each has been considered separately as against the files and records herein.

The scrambling of the facts, circumstances and supplied motivations of this § 2255 application must be deemed to stem from a calculated assemblage in depth of carefully contrived misconceptions to blot out the real facts and material considerations.

of Cancio's dealings with Possas in May 1971 and not at any other time. The summation reads:

In addition to that, Lorenzo Cancio testified that he dealt in cocaine and not in heroin. That is over and above everything else, but that Lorenzo Cancio was her [Possas'] only source for narcotics is absurd in the light of what she put in her statement here, which was read to you, and also absurd in light of what she said to Agent Lepore, *on the date in question,* the time that she met him when she named her other sources. (Emphasis added).

## II.

Petitioner has sought to gain some technical mileage from the entry of the judgment of December 3, 1980 based on the dispositive order of November 25, 1980. That judgment is the product of a clerical error of the Clerk. There was no authorization, direction, or requirement for a judgment. The order of November 25, 1980 finally disposed of the § 2255 petition. See the Rules Governing Proceedings in the United States District Courts under Section 2255 of 28 U.S.C., especially Rules 1 and 11 thereof; see also, Pub.L. 94–426 § 1, Sept. 28, 1976, 90 Stat. 1334.

The only finding required from the Court on the § 2255 petition necessary to a denial thereof was supplied, viz.: that "the files and records of the case conclusively show that the petitioner is entitled to no relief." That view is now strongly reinforced by the re-study occasioned by the attempted reargument.

Furthermore, in conformity with the preference expressed by the Court of Appeals in *Newfield v. United States,* 565 F.2d 203 (2d Cir. 1977), this Court did set forth in its memoranda of July 22, 1980 and November 25, 1980, its reasons for denying the relief sought.

## III.

Accordingly, the judgment entered on December 3, 1980 is vacated as having been entered inappropriately as the result of a clerical error; it was not required by the Court or Rule and was unnecessary to the finality of the order of November 25, 1980.

In all other respects, the defendant's motions are denied.

SO ORDERED.

Walker was discussing the absence of any heroin dealings in May by Cancio. Nobody at the trial disputed this and it is indisputable on the evidence. It was thus perfectly legitimate in summarizing the evidence concerning the date in question to which he was alluding, namely, May 1971, to say that Cancio testified he dealt in cocaine and not in heroin—at that time! Consequently, petitioner's persistence in suggesting that Walker was hiding Cancio's heroin activities is just utter nonsense wrenched from context.